**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____

)
LEGAL TECHNOLOGY GROUP, INC., )
d/b/a ESENTIO TECHNOLOGIES, )
)
       Plaintiff, )
)
    v. )
)
RAJIV MUKERJI and HBR )
CONSULTING LLC, )
)
       Defendants. )
_____ )     Civil Action No. 17-631 (RBW)
)
RAJIV MUKERJI, )
)     <u>**UNDER SEAL**</u>
       Counter-Plaintiff, )
)
    v. )
)
LEGAL TECHNOLOGY GROUP, INC., )
d/b/a ESENTIO TECHNOLOGIES, )
)
       Counter-Defendant. )
_____ )

<u>**MEMORANDUM OPINION**</u>

The plaintiff, Legal Technology Group, Inc., doing business as eSentio Technologies ("eSentio"), filed this civil action against its former employee, Rajiv Mukerji, and Mukerji's current employer, HBR Consulting LLC ("HBR"), alleging breach of contract against Mukerji (Count I), tortious interference with contract against HBR (Count II), and tortious interference with prospective economic advantage against both defendants (Count III). <u>See generally</u> Complaint ("Compl."). Currently pending before the Court are the parties' cross-motions for summary judgment. <u>See</u> Plaintiff Legal Technology Group, Inc.'s Motion for Summary Judgment as to Liability and as to Defendant Rajiv Mukerji's Counterclaim ("eSentio's Mot.");

1

Defendant HBR Consulting LLC's Motion for Summary Judgment ("HBR's Mot."); Defendant

Rajiv Mukerji's Motion for Summary Judgment on Counts I and III of Plaintiff Legal

Technology Group[,] [Inc.]'s Complaint ("Mukerji's Mot.").  Upon careful consideration of the

parties' submissions,[1] the Court concludes that it must grant in part and deny in part the

plaintiff's motion and deny the defendants' motions.

## I.  BACKGROUND

"eSentio . . . provides business and technology consulting and implementing services to

the world's largest law firms and corporate legal departments," eSentio's Facts ¶ 1; see HBR's

Reply to eSentio's Facts ¶ 1, and "eSentio and HBR are competitors in the document[]

management space," HBR's Reply to eSentio's Facts ¶ 20; see eSentio's Facts ¶ 20 ("eSentio

and HBR are competitors").  Mukerji is a former employee of eSentio and a current employee of

---

[1] In addition to the filings already identified, the Court considered the following submissions in rendering its decision: (1) the Memorandum of Points and Authorities in Support of Defendant HBR Consulting LLC's Motion for Summary Judgment ("HBR's Mem."); (2) the Statement of Undisputed Material Facts in Support of Defendant HBR Consulting LLC's Motion for Summary Judgment ("HBR's Facts"); (3) Plaintiff Legal Technology Group, Inc.'s Memorandum in Support of Its Motion for Summary Judgment as to Liability and as to Defendant Rajiv Mukerji's Counterclaim ("eSentio's Mem."); (4) the Plaintiff's Statement of Undisputed Facts ("eSentio's Facts"); (5) Defendant Rajiv Mukerji's Memorandum in Support of His Motion for Summary Judgment on Counts I and III of Plaintiff Legal Technology Group[,] [Inc.]'s Complaint ("Mukerji's Mem."); (6) Affidavit of Rajiv Mukerji ("Mukerji Aff."); (7) Defendant HBR Consulting LLC's Memorandum in Opposition to Plaintiff Legal Technology Group, Inc.'s Motion for Summary Judgment as to Liability ("HBR's Opp'n"); (8) Defendant HBR Consulting LLC's Response to Plaintiff's Statement of Undisputed Facts ("HBR's Reply to eSentio's Facts"); (9) Plaintiff Legal Technology Group, Inc.'s Opposition to Defendant HBR Consulting LLC's Motion for Summary Judgment ("eSentio's Opp'n to HBR's Mot."); (10) Plaintiff Legal Technology Group, Inc.'s Opposition to Defendant Rajiv Mukerji's Motion for Summary Judgment ("eSentio's Opp'n to Mukerji's Mot."); (11) Defendant Rajiv Mukerji's Opposition to Legal Technology Group, Inc.'s Motion for Summary Judgment as to Liability on It[s] Claims Against Him and as to His Counterclaim for Breach of LTG's Promise to Pay an Annual Bonus ("Mukerji's Opp'n"); (12) Defendant and Counterclaim Plaintiff Rajiv Mukerji's Response to Legal Technology Group, Inc.'s Proffered Statement of Undisputed Facts ("Mukerji's Reply to eSentio's Facts"); (13) Plaintiff Legal Technology Group, Inc.'s Reformatted Response to the Statement of Facts Offered in Support of Defendant HBR Consulting's Motion for Summary Judgment ("eSentio's Reply to HBR's Facts"); (14) Plaintiff Legal Technology Group, Inc.'s Reformatted Response to the Statement of Facts Offered in Support of Defendant Rajiv Mukerji's Motion for Summary Judgment ("eSentio's Reply to Mukerji's Facts"); (15) Defendant HBR Consulting LLC's Reply in Further Support of Its Motion for Summary Judgment ("HBR's Reply"); (16) Plaintiff Legal Technology Group, Inc.'s Reply Brief in Support of Motion for Summary Judgment ("eSentio's Reply"); and (17) Defendant Rajiv Mukerji's Reply to LTG's Opposition to Mr. Mukerji's Memorandum in Support of His Motion for Summary Judgment ("Mukerji's Reply").

HBR.  See eSentio's Facts ¶ 17; HBR's Reply to eSentio's Facts ¶ 17; Mukerji's Reply to

eSentio's Facts ¶ 17.

"Mukerji began his employment with eSentio on or about August 15, 2011."  eSentio's

Facts ¶ 12; see HBR's Reply to eSentio's Facts ¶ 12; Mukerji's Reply to eSentio's Facts ¶ 12.

At eSentio, Mukerji "served as the Director of eSentio's Document Management System

('DMS') practice," eSentio's Facts ¶ 13; see HBR's Reply to eSentio's Facts ¶ 13; Mukerji's

Reply to eSentio's Facts ¶ 13, and he became "one of [eSentio's] leading NetDocuments

consultants for large firms," eSentio's Facts ¶ 16; see HBR's Reply to eSentio's Facts ¶ 16;

Mukerji's Reply to eSentio's Facts ¶ 16.[2]  "In connection with [h]is hiring by eSentio in 2011,

Mukerji executed an offer letter dated July 18, 2011 (the 'Offer Letter')."  eSentio's Facts ¶ 88;

see Mukerji's Reply to eSentio's Facts ¶ 88.  Among other provisions, the Offer Letter contains a

provision regarding Mukerji's compensation, which provides, inter alia, that Mukerji would "be

eligible for an annual performance bonus based on the pre-defined performance objectives in the

amount of [$]20,000.00 prorated from [his] start date" (the "Bonus Provision").  eSentio's Mot.,

Exhibit ("Ex.") 14 (Offer Letter) at LTG – 1.

"[A]s a condition of his employment, [eSentio required Mukerji] to execute eSentio's

Employment Agreement on Ideas, Inventions[,] and Confidential Information (the

'[Employment] Agreement')[,]" which Mukerji "signed . . . on July 20, 2011."  eSentio's Facts

¶ 21; see HBR's Reply to eSentio's Facts ¶ 21; Mukerji's Reply to eSentio's Facts ¶ 21.

Relevant here, the Agreement includes a "Non-Competition" provision (the "restrictive

covenant"), which provides:

> I hereby covenant and agree that at no time during my employment with [eSentio]
> and for a period of one year immediately following the termination of my

---

[2] According to eSentio, NetDocuments is "a cloud-based document and e[-]mail management platform."  eSentio's
Facts ¶ 3.

employment . . . with [eSentio], will I act in any way, directly or indirectly, to solicit, divert or takeaway any client of [eSentio] or prospect that I have been involved in pursuing business with during the six months prior to the termination of my employment with the company. I understand that this "non-compete" is intended to include accepting employment with a client of [eSentio] for the period and involvement stated above. An eSentio client is defined as a firm that eSentio has sold product [to] or performed services for in the previous two years from date of termination of employment.

eSentio's Mot., Ex. 14 (Employment Agreement) § 3.8; see eSentio's Facts ¶ 23; HBR's Reply to eSentio's Facts ¶ 23; Mukerji's Reply to eSentio's Facts ¶ 23.

On June 20, 2016, "Mukerji accepted [an] offer [of employment] with HBR . . . and gave notice to eSentio the same day." eSentio's Facts ¶ 17; see HBR's Reply to eSentio's Facts ¶ 17; Mukerji's Reply to eSentio's Facts ¶ 17. "Mukerji's final day of active employment with eSentio was July 15, 2016." eSentio's Facts ¶ 17; see HBR's Reply to eSentio's Facts ¶ 17; Mukerji's Reply to eSentio's Facts ¶ 17.

## A. The Akin Gump LLP ("Akin") Projects

"Beginning in late 2015, the [Chief Information Officer] of Akin, Mike Lucas, and [eSentio's President, Yvonne] Dornic[,] began discussing the possibility of Akin moving to the NetDocuments platform." eSentio's Facts ¶ 27; see HBR's Reply to eSentio's Facts ¶ 27; Mukerji's Reply to eSentio's Facts ¶ 27. "Dornic provided [ ] Lucas information and advice about NetDocuments[] and informally consulted with him throughout the spring and summer of 2016, explaining eSentio's expertise and educating [ ] Lucas on various aspects of the platform." eSentio's Facts ¶ 27; see HBR's Reply to eSentio's Facts ¶ 27; Mukerji's Reply to eSentio's Facts ¶ 27. "Dornic expected Akin would likely be transitioning to NetDocuments relatively soon and that eSentio would almost certainly be selected to provide assistance in the conversion." eSentio's Facts ¶ 27; see HBR's Reply to eSentio's Facts ¶ 27; Mukerji's Reply to eSentio's Facts ¶ 27.

"In the fall of 2016, Akin [ ] committed to transitioning to NetDocuments, and it sought proposals from vendors to assist in a NetDocuments Conversion Project, as well as a related Information Governance Project" (collectively, the "Akin Project"). eSentio's Facts ¶ 28; see HBR's Reply to eSentio's Facts ¶ 28; Mukerji's Reply to eSentio's Facts ¶ 28. The NetDocuments Conversion Project "would [involve] a large-scale, firm-wide migration of Akin's document management system from iManage to NetDocuments." eSentio's Facts ¶ 29; see HBR's Reply to eSentio's Facts ¶ 29; Mukerji's Reply to eSentio's Facts ¶ 29. "Akin['s] project team was made up of [TJ] Whelan, Brian Cooke, . . . and Juanita Bright[.]" HBR's Facts ¶ 26; see eSentio's Reply to HBR's Facts ¶ 26.

"On November 1, 2016, [ ] Whelan reached out to Senthil Rajakrishnan, a Senior Director at HBR, to inquire about HBR's information governance capabilities." HBR's Facts ¶ 43; see eSentio's Reply to HBR's Facts ¶ 43. "In response to [ ] Whelan's inquiry, on November 23, 2016, [ ] Rajakrishnan, Ray Fashola, . . . and [ ] Mukerji participated in a phone call with the Akin [ ] [P]roject team to discuss information governance." HBR's Facts ¶ 44 (internal citation omitted); see eSentio's Reply to HBR's Facts ¶ 44.

As to the NetDocuments Conversion Project, "Akin [ ] initially identified Fireman & Company, eSentio, and Kraft and Kennedy as potential partners for the [ ] [P]roject." HBR's Facts ¶ 27; see eSentio's Reply to HBR's Facts ¶ 27. However, "[a]t some point prior to [Whelan's] November 23, 2016 conference call with [HBR] . . . , [ ] Whelan learned that [ ] Mukerji had NetDocuments conversion experience and . . . had left eSentio," HBR's Facts ¶ 46; see eSentio's Reply to HBR's Facts ¶ 46, and "that [ ] Mukerji was one of the most experienced people with [ ] NetDoc[uments] conversions," HBR's Facts ¶ 47; see eSentio's Reply to HBR's Facts ¶ 47. "Upon learning that [ ] Mukerji was [ ] with HBR, [ ] Whelan initiated discussions

with HBR about Akin['s] NetDocuments [C]onversion [P]roject."  HBR's Facts ¶ 48; <u>see</u>

eSentio's Reply to HBR's Facts ¶ 48.  Specifically, "[o]n approximately December 1, 2016, [ ]

Whelan called [ ] Mukerji to discuss the information [ ] Whelan had heard about [ ] Mukerji's

experience with NetDocuments conversions," HBR's Facts ¶ 49; <u>see</u> eSentio's Reply to HBR's

Facts ¶ 49, and "requested that HBR submit a proposal . . . [for] the NetDocuments [C]onversion

[Project]," HBR's Facts ¶ 53; <u>see</u> eSentio's Reply to HBR's Facts ¶ 53.

On December 5, 2016, Mukerji submitted HBR's final proposal for the Information

Governance Project.  <u>See</u> eSentio's Facts ¶ 47; <u>see also</u> HBR's Reply to eSentio's Facts ¶ 47;

Mukerji's Reply to eSentio's Facts ¶ 47; eSentio's Mot., Ex. 41 ████████████████████

████████████████) at HBR_00000001 (attaching HBR's "Information Governance

Assessment").  Then, "[o]n December 28, 2016, HBR submitted its statement of work for . . .

[the] NetDocuments [Conversion] [P]roject," HBR's Facts ¶ 56; <u>see</u> eSentio's Reply to HBR's

Facts ¶ 56, which "estimated fees at $161,920," HBR's Facts ¶ 57; <u>see</u> eSentio's Reply to HBR's

Facts ¶ 57.  eSentio also submitted "a proposal for $1,514,250.00 for [the] NetDocuments

[C]onversion [Project]" on December 13, 2016.  HBR's Facts ¶ 35; <u>see</u> eSentio's Reply to

HBR's Facts ¶ 35. Two other firms—Fireman & Company and Kraft and Kennedy—also

"provided proposals [for the NetDocuments Conversion Project] that were very similar in scope

and . . . cost to HBR's" proposal.  HBR's Facts ¶ 61 (internal quotation marks omitted); <u>see</u>

eSentio's Reply to HBR's Facts ¶ 61.  "On or about January 20, 2017, Akin awarded . . . [both]

[p]roject[s] to HBR."  eSentio's Facts ¶ 64; <u>see</u> HBR's Reply to eSentio's Facts ¶ 64; Mukerji's

Reply to eSentio's Facts ¶ 64.

**B.      The King & Spalding LLP ("King & Spalding") Project**

"In December 2016, King & Spalding engaged NetDocuments to perform conversion services from iManage to NetDocuments."  HBR's Facts ¶ 66; <u>see</u> eSentio's Reply to HBR's Facts ¶ 66.  Like Akin, "King & Spalding was interested in engaging a consultancy to supplement NetDocuments' services."  HBR's Facts ¶ 67; <u>see</u> eSentio's Reply to HBR's Facts ¶ 67.  Thus, "[o]n January 10, 2017, King & Spalding issued a Request for Proposal ('RFP') for NetDocuments conversion consulting services [(the 'King & Spalding Project')], soliciting responses from HBR, eSentio, Adaptive, Fireman & Company, and InOutsource."  HBR's Facts ¶ 72; <u>see</u> eSentio's Reply to HBR's Facts ¶ 72.

"On January 27, 2017, HBR submitted its response to King & Spalding's RFP."  HBR's Facts ¶ 111; <u>see</u> eSentio's Reply to HBR's Facts ¶ 111.  King & Spalding also "received responses . . . [from] Adaptive, eSentio, [ ] and InOutsource."  HBR's Facts ¶ 75; <u>see</u> eSentio's Reply to HBR's Facts ¶ 75.  "On or about March 22, 2017, King & Spalding awarded the [King & Spalding] Project to HBR."  eSentio's Facts ¶ 65; <u>see</u> HBR's Reply to eSentio's Facts ¶ 65; Mukerji's Reply to eSentio's Facts ¶ 65.

eSentio filed its Complaint against HBR and Mukerji on April 10, 2017, <u>see</u> Compl. at 1, and fact discovery concluded on June 28, 2018, <u>see</u> Order at 2 (May 1, 2018), ECF No. 44.  Shortly thereafter, on July 19, 2018, the parties filed their cross-motions for summary judgment.  <u>See</u> eSentio's Mot. at 1; HBR's Mot. at 1; Mukerji's Mot. at 1.

## II.      STANDARD OF REVIEW

Courts will grant a motion for summary judgment under Federal Rule of Civil Procedure 56(a) "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  When ruling on a Rule

56(a) motion, the Court must view the evidence in the light most favorable to the non-moving party. See Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006) (citing Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 150 (2000)). The Court must therefore draw "all justifiable inferences" in the non-moving party's favor and accept the non-moving party's evidence as true. Anderson v. Liberty Lobby, 477 U.S. 242, 255 (1986).

In responding to a motion for summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Accordingly, the non-moving party must not rely on "mere allegations or denials . . . but . . . must set forth specific facts showing that there [are] [ ] genuine issue[s] for trial." Anderson, 477 U.S. at 248 (second omission in original) (citation and internal quotation marks omitted). Thus, "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position [is] insufficient" to withstand a motion for summary judgment, as "there must be [some] evidence on which the jury could reasonably find for the [non-movant]." Id. at 252.

### III. ANALYSIS

eSentio seeks "summary judgment in its favor as to [the d]efendants' liability on Counts I, II[,] and III . . . [of its] Complaint," which allege "causes of action [(1)] against [ ] Mukerji for breach of contract arising out of Mukerji's violation of . . . [his] restrictive covenant [ ] (Count I); [(2)] against . . . HBR . . . for tortiously interfering with, and inducing the breach of, Mukerji's [restrictive covenant] (Count II); and [(3)] against both [d]efendants for tortiously interfering with eSentio's prospective contracts with . . . [Akin and King & Spalding] (Count III)." eSentio's Mot. at 1. Additionally, eSentio seeks summary judgment in its favor on Mukerji's Counterclaim, see eSentio's Mot. at 2, which alleges breach of contract against eSentio arising

out of eSentio's alleged failure to comply with the Bonus Provision of Mukerji's Offer Letter, see Answer and Counterclaim of Defendant Rajiv Mukerji (Jury Demand Endorsed) ("Mukerji's Answer") at 11, ¶¶ 7–9. HBR and Mukerji both seek summary judgment in their favor on all claims against them and on eSentio's claim for punitive damages. See HBR's Mot. at 1; Mukerji's Mot. at 1. The Court will address each of eSentio's claims and Mukerji's Counterclaim in turn.

As an initial matter, the Court notes that because "federal jurisdiction in this case is based on diversity of citizenship, . . . state law provides the substantive rules of law with regard to all claims." Base One Techs., Inc. v. Ali, 78 F. Supp. 3d 186, 192 (D.D.C. 2015); see Compl. ¶ 5 ("This Court has subject matter jurisdiction of this dispute pursuant to 28 U.S.C. § 1332 (Diversity).").[3] Because Mukerji's Employment Agreement and Offer Letter provide that their "terms will be governed by the laws of the District of Columbia," eSentio's Mot., Ex. 14 (Employment Agreement) § 13; see id., Ex. 14 (Offer Letter) at LTG – 2 ("[T]his letter . . . shall be governed by and construed in accordance with the substantive laws of the District of Columbia."), the Court concludes that it must apply District of Columbia law to eSentio's and Mukerji's breach of contract claims, which arise out of the Employment Agreement and the Offer Letter, respectively, see Compl. ¶¶ 40–41; Mukerji's Answer at 11, ¶¶ 3, 7–9.

---

[3] Diversity jurisdiction exists "where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between[] . . . citizens of different States." 28 U.S.C. § 1332. Here, both requirements are satisfied. First, the plaintiff seeks "compensatory damages in an amount . . . not less than $2,000,000," Compl. at 13, which obviously exceeds the $75,000 requirement. Second, "each defendant is a citizen of a different State from [the] plaintiff." Lifeline, Inc. v. Bakari, 107 F. Supp. 3d 38, 40 (D.D.C. 2015) (quoting Owen Equip. & Erection Co. v. Kroger, 437 U.S. 365, 373 (1978)). As explained in the Court's prior Order, "the parties do not dispute that eSentio is a citizen of Delaware and the District of Columbia, and Mukerji admits that he 'is a citizen of[] . . . Ohio.'" Order at 2 (Mar. 27, 2019), ECF No. 81 (internal citations omitted). And, based on HBR's admission that its two members are citizens of Illinois, see Defendant HBR Consulting LLC's Response to Order (Dkt. 81) at 1, the Court concludes that HBR, a limited liability company, is a citizen of Illinois for diversity jurisdiction purposes, see Johnson-Brown v. 2200 M St. LLC, 257 F. Supp. 2d 175, 178 (D.D.C. 2003) (explaining that a non-corporate entity such as a limited liability company "carr[ies] the citizenship of [its] members").

Additionally, "[a]lthough a contractual choice-of-law provision does not bind parties with respect to non-contractual causes of action," Base One Techs., Inc., 78 F. Supp. 3d at 192, the Court also finds it appropriate to apply District of Columbia law to eSentio's remaining tortious interference claims given that "[t]he parties have not raised any choice of law issues and[] . . . have relied [almost entirely] on District of Columbia law," Piedmont Resolution, LLC v. Johnston, Rivlin & Foley, 999 F. Supp. 34, 39 (D.D.C.1998); see Base One Techs., Inc., 78 F. Supp. 3d 192 (relying on New York law for non-contractual causes of action where a "choice-of-law provision" required application of New York law for the parties' contractual claims and "the parties . . . rel[ied] solely on New York law with respect to all of the counts").

## A. eSentio's Breach of Contract Claim (Count I)

eSentio and Mukerji both seek summary judgment on Count I of the Complaint, which alleges that "Mukerji [ ] breached [his Employment] Agreement by[] . . . acting to solicit, divert or take away eSentio clients and prospects, . . . including but not limited to . . . Akin and King & Spalding." Compl. ¶ 45. "To prevail on a claim of breach of contract [under District of Columbia law], a party must establish (1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by [the] breach." Francis v. Rehman, 110 A.3d 615, 620 (D.C. 2015) (emphasis omitted) (quoting Tsintolas Realty Co. v. Mendez, 984 A.2d 181, 187 (D.C. 2009)).

eSentio argues that it "is entitled to summary judgment as to liability on Count I" of its Complaint, eSentio's Mem. at 8, because (1) "it cannot be disputed that . . . [the restrictive covenant] satisfies all the requirements for validity and enforceability under [District of Columbia] law," id. at 9; (2) Akin and King & Spalding were both "clients" or "prospects" under the restrictive covenant, see id. at 11–14, 17; (3) Mukerji breached the restrictive covenant by

10

"t[aking] steps to 'solicit, divert, or take away'" the Akin and King & Spalding Projects, id. at 14, 17; and (4) Mukerji's breach resulted in damages to eSentio, see id. at 22–25. Despite seeking summary judgment in his favor as to eSentio's breach of contract claim, see Mukerji's Mot. at 1, Mukerji responds that "genuine issues preclude summary judgment in favor of eSentio," Mukerji's Opp'n at 14. Specifically, he argues that genuine factual issues exist as to: whether "Akin . . . [is] a restricted client," such that he had a contractual duty as to Akin, id. at 15; whether he "did anything to solicit, divert, or take away" Akin and King & Spalding, id. at 14–15; and whether his conduct caused eSentio damages, see Mukerji's Reply at 17. Additionally, he argues that a genuine factual issue exists as to whether any "breach [by him] was excused by eSentio's breach of its [a]greement to pay . . . [him] an [a]nnual [p]erformance [b]onus." Mukerji's Opp'n at 15. The Court will address each of the elements of eSentio's breach of contract claim in turn.

### 1.     The Existence of a Valid Contract

"In order to be valid, covenants not to compete must protect some legitimate interest of the employer and must be reasonable in their scope." Mercer Mgmt. Consulting, Inc. v. Wilde, 920 F. Supp. 219, 237 (D.D.C. 1996). "Restrictions are unreasonable if 'the restraint is greater than is needed to protect the promisee's legitimate interest, or . . . the promisee's need is outweighed by the hardship to the promisor and the likely injury to the public.'" Id. (quoting Ellis v. Hurson Assocs., Inc., 565 A.2d 615, 618 (D.C. 1989)). "Significantly, a 'restraint is easier to justify . . . if the restraint is limited to the taking of [a] former employer's customers as contrasted with competition in general.'" Id. (quoting Ellis, 56 A.2d at 618).

eSentio argues that the restrictive "covenant . . . protect[s] eSentio's legitimate business interests[] . . . [because] it prevents Mukerji from taking advantage of his critical leadership role at eSentio[] and his relationship with eSentio clients and prospective clients[] to compete

unfairly with eSentio." eSentio's Mem. at 9. eSentio further argues that "[b]ecause the covenant . . . only [prohibits Mukerji] from engaging in specified competitive activities with regard to a precisely defined group of 'clients' and 'prospects,' the covenant is plainly reasonable in scope and, accordingly, fully enforceable." Id. at 10–11. Mukerji does not dispute the validity of the restrictive covenant. See generally Mukerji's Mem.; Mukerji's Opp'n; Mukerji's Reply.

Taking into consideration eSentio's undisputed arguments as to the validity of the restrictive covenant, the Court concludes that eSentio has demonstrated that the covenant is valid. The interests that eSentio asserts are protected by the restrictive covenant, see eSentio's Mem. at 9, constitute "legitimate interests" under District of Columbia law, see Mercer Mgmt. Consulting, Inc., 920 F. Supp. at 237 (recognizing as "legitimate interests" an employer's desire "to protect the investment made in its employees, preserve the confidentiality of information gleaned in the course of employment . . . , and protect itself from its employees leaving and capitalizing on [its] client base"). Additionally, the Court finds that the restrictive covenant's one-year length is reasonable given that District of Columbia courts have found similar and even significantly longer time periods reasonable. See id. (upholding a one-year restrictive covenant); see also Ellis, 565 A.2d at 621 (concluding that a "three[-]year time duration . . . was sufficiently reasonable" and observing that "agreements limiting competition for a period well in excess of three years have been sustained in this jurisdiction"). Moreover, the Court agrees with eSentio that a prohibition against soliciting, diverting, or taking away eSentio's clients or prospects is reasonable in scope given that it "is limited to the taking of [eSentio's] customers as contrasted with competition in general," Ellis, 565 A.2d at 619, and also given Mukerji's "active[] engage[ment] with eSentio clients and prospective clients," eSentio's Facts ¶ 14; see Mukerji's

Reply to eSentio's Facts ¶ 14; <u>Mercer Mgmt. Consulting, Inc.</u>, 920 F. Supp. at 237 (concluding that an employer's one-year restriction on "rendering of services to [its] clients" was "reasonable and enforceable" given "the vital importance of its client base to its business[] and the close contacts established between its consultants and its client base").  Accordingly, the Court concludes that eSentio has satisfied the first element of its breach of contract claim against Mukerji.

### 2. The Existence of an Obligation or Duty Arising Out of the Contract

eSentio argues that the restrictive covenant creates an obligation as to Akin and King & Spalding because Akin was both a "client" and "prospect," <u>see</u> eSentio's Mem. at 11–14, and King & Spalding was a "prospect," <u>id.</u> at 17.  Mukerji responds that "Akin [ ] was not a [r]estricted [c]lient or prospect" because ████████████████████████████ ████████████████████████████████ Mukerji's Opp'n at 20. However, Mukerji does not dispute King & Spalding's status as a "prospect."  <u>See generally</u> Mukerji's Mem.; Mukerji's Opp'n; Mukerji's Reply.  The Court will address the restrictive covenant's application to each firm separately.

### a. Whether Akin Was a "Client" or "Prospect"

The Court first addresses the parties' dispute with respect to Akin, which turns on their differing interpretations of the restrictive covenant's language.  As already explained, the restrictive covenant prohibits Mukerji from "act[ing] in any way, directly or indirectly, to solicit, divert or takeaway any client of [eSentio] or prospect that [he] ha[d] been involved in pursuing business with during the six months prior to the termination of [his] employment with [eSentio]." eSentio's Mot., Ex. 14 (Employment Agreement) § 3.8.  The restrictive covenant further defines a "client" as "a firm that eSentio has sold product [to] or performed services for in the previous two years from date of termination of employment." <u>Id.</u>, Ex. 14 (Employment Agreement) § 3.8

Mukerji argues that "[t]he phrase . . . 'that [he] ha[d] been involved in pursuing business

with during the six months prior to the termination of [his] employment' [(the 'six-month

involvement limitation')], fairly read, applies to both [a] 'client of [eSentio]' as well as [a]

'prospect,'" and, because "he was not involved in pursuing business with Akin [ ] in the six

months prior to the termination of his employment," Akin was neither a "client" nor a

"prospect." Mukerji's Opp'n at 20. Alternatively, Mukerji argues that if the restrictive covenant

"were susceptible of more than this one fair reading, . . . such ambiguity would open the door to

evidence of the parties' bargaining history," and "[t]he bargaining history in this case reveals the

parties' intent to apply involvement to both prospects and clients." Id. at 21. eSentio responds

that "any fair reading of the [restrictive covenant] demonstrates that the six-month [involvement

limitation] applies only to 'prospect' and not to 'client,'" eSentio's Reply at 2, and thus, whether

Mukerji worked with Akin in the six months prior to his termination has no bearing on whether

Akin qualifies as a "client" under the restrictive covenant. It further argues that "Mukerji's

reading of the contract renders other terms meaningless . . . [because] there would be no need to

distinguish between 'clients' and 'prospects' at all, [as] in both cases, the six-month

[involvement limitation] would define the full scope of the restriction, and the clause would

simply refer to 'firms' or 'entities' or some other all-encompassing term." Id. Additionally, it

argues that "Mukerji cannot create a genuine dispute of material fact by arguing that he reads the

contract a different [ ] way, as contract construction is for the Court," and thus, "Mukerji's effort

to introduce the parties' bargaining history and related parol evidence should be rejected." Id. at

3 (emphasis omitted). Finally, eSentio argues that, in any event, "the bargaining history . . .

proves conclusively that the plain and unambiguous language included in the final version of the

[Employment] Agreement expresses the parties' intent." Id.

As the District of Columbia Court of Appeals has explained, "when interpreting a contract, 'the court should look to the intent of the parties entering into the agreement.'" <u>Steele Founds., Inc. v. Clark Constr. Grp., Inc.</u>, 937 A.2d 148, 154 (D.C. 2007) (citation omitted). However, "[t]he question of intent is resolved by an objective inquiry, and '[t]he first step' is therefore to determine 'what a reasonable person in the position of the parties would have thought the disputed language meant.'" <u>Id.</u> (second alteration in original) (citation omitted). Accordingly, "the written language embodying the terms of an agreement will govern the rights and liabilities of the parties [regardless] of the intent of the parties at the time they entered into the contract, unless the written language is not susceptible of a clear and definite undertaking, or unless there is fraud, duress, or mutual mistake." <u>Tillery v. D.C. Contract Appeals Bd.</u>, 912 A.2d 1169, 1176 (D.C. 2006) (citation omitted). Additionally, "[c]ontractual provisions are interpreted taking into account the contract as a whole, so as to give effect, if possible, to all of the provisions in the contract." <u>Steele Founds., Inc.</u>, 937 A.2d at 154.

Applying these principles here, the Court must reject Mukerji's position that the six-month involvement limitation applies to a "client" subject to the restrictive covenant. As eSentio correctly notes, <u>see</u> eSentio's Reply at 2, Mukerji's interpretation would render meaningless the distinction between a "client" and a "prospect" in the context of the restrictive covenant's prohibition against "solicit[ing], divert[ing,] or tak[ing away]," eSentio's Mot., Ex. 14 (Employment Agreement) § 3.8. Specifically, Mukerji's interpretation would mean that the restrictive covenant covers any "client" or "prospect," i.e., any firm, so long as Mukerji was "involved in pursuing business with [the firm] during the six months prior to [his] termination." <u>Id.</u>, Ex. 14 (Employment Agreement) § 3.8. Thus, in the context of the prohibition against "solicit[ing], divert[ing,] or tak[ing away]," <u>id.</u>, Ex. 14 (Employment Agreement) § 3.8, there

would be no need to distinguish between a "client" and a "prospect," and the restrictive covenant's definition of "client"— "a firm that eSentio has sold product or performed services for in the previous two years from date of termination of employment," id., Ex. 14 (Employment Agreement) § 3.8—would be unnecessary.  Such an interpretation does not square with the District of Columbia Court of Appeals' instruction that the Court must "give effect, if possible, to all of the provisions in the contract."  Steele Foundations, Inc., 937 A.2d at 154.

Nonetheless, Mukerji argues that, "[s]ince the parties used [ ] Mukerji's involvement to define [c]lients from whom he could not accept employment in the second sentence of § 3.8(a), [his involvement] also applies to those [c]lients whom he could not solicit, divert or take away in the first sentence."  Mukerji's Opp'n at 21.  Mukerji's argument refers to a part of the covenant which states: "[T]his 'non-compete' is intended to include accepting employment with a client of [eSentio] for the period and involvement stated above."  eSentio's Mot., Ex. 14 (Employment Agreement) § 3.8.  However, even assuming that the phrase "period and involvement stated above" incorporates the six-month involvement limitation contained in the preceding sentence, it only incorporates that limitation for purposes of a prohibition against accepting employment with an eSentio client and does not purport to apply it to the prohibition against soliciting, diverting, or taking away clients.  Thus, the plain language of the restrictive covenant provides the Court with no basis to adopt Mukerji's position that the limitation on clients with which Mukerji could not accept employment must comport with the limitations on clients that Mukerji could not solicit, divert, or take away.

Having concluded that a "client" need not be a firm that Mukerji was "involved in pursuing business with during the six months prior to [his] termination," eSentio's Mot., Ex. 14 (Employment Agreement) § 3.8, the Court must conclude that Akin qualifies as a client subject

to the restrictive covenant. The restrictive covenant defines a "client" as "a firm that eSentio has sold product [to] or performed services for in the previous two years from date of termination of employment." eSentio's Mot., Ex. 14 (Employment Agreement) § 3.8. ██████████ ████████████████████████████████████████████ HBR's Reply to eSentio's Facts ¶ 38; see Mukerji's Reply to eSentio's Facts ¶ 38 (incorporating HBR's response to ¶ 38 of eSentio's Facts), ████████████████████████████████████████████████ ██████████████████████████ see eSentio's Facts ¶ 17; HBR's Reply to eSentio's Facts ¶ 17; Mukerji's Reply to eSentio's Facts ¶ 17. Thus, Akin qualified as a "client" subject to the restrictive covenant, and consequently, Mukerji had a contractual duty not to solicit, divert or take away Akin's business.[4]

### b. Whether King & Spalding Was a "Prospect"

eSentio argues that King & Spalding was a "prospect" under the restrictive covenant because ████████████████████████████████████████████████ ██████████████████████████████ eSentio's Mem. at 17; see eSentio's Facts ¶ 52 (citing ██████████████████████████). Although Mukerji "disputes whether any of the exhibits cited by eSentio . . . evince his involvement in pursuing business from [King & Spalding], . . . [he] does not dispute ████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████ Mukerji's Reply to eSentio's Facts ¶ 52. Based on this undisputed fact, the Court concludes that eSentio has demonstrated that King & Spalding was a "prospect that [Mukerji] ha[d] been involved in pursuing business with during the six months prior to the termination of [his] employment with

---

[4] Because the Court concludes that Akin is a "client" subject to the restrictive covenant, it need not address the parties' arguments with respect to whether Akin was also a "prospect."

[eSentio]," eSentio's Mot., Ex. 14 (Employment Agreement) § 3.8, and thus, he had a contractual duty as to King & Spalding under the restrictive covenant.

### 3. Whether Mukerji Acted to, Directly or Indirectly, Solicit, Divert, or Take Away Akin or King & Spalding

#### a. Akin

Mukerji argues that he "did not solicit, divert[,] or take away" Akin's business because he "never initiated sales activity with respect to Akin," Mukerji's Opp'n at 16, and only "responded to Akin['s] unsolicited requests for proposals or helped someone at HBR do so," id. at 20. Specifically, he argues that "[c]ourts that found solicitation . . . require some proactive step by the employee, like initiating the customer contact, . . . meeting with the customer after the proposal and before the award, . . . or otherwise taking proactive steps that went beyond responding to the proposal," Mukerji's Reply at 14, and because "no reasonable juror[] . . . could conclude that [he] took proactive steps that went beyond responding to an RFP, he is entitled to summary judgment in his favor and against eSentio on [eSentio's] breach of contract claims," id. at 15. eSentio responds that "the undisputed evidence in the record demonstrates that Mukerji took action to 'solicit, divert, or take away' [the Akin Project] from eSentio," eSentio's Mem. at 16, because the evidence shows that "Mukerji played . . . the principal role[] in HBR's efforts to secure the award," including by "playing a substantive role not only in preparing HBR's bid . . . , but also in writing the proposal and interacting substantively and materially with the Akin personnel responsible for reviewing the qualifications of the competing firms and selecting the winner," id. at 14–15. It further argues that "the fact that Akin requested a bid" is "immaterial" because "the steps Mukerji took after this request constitute direct efforts, by him, to solicit, divert or take away the Akin Project." eSentio's Opp'n to Mukerji's Mot. at 3.

To resolve the parties' dispute, the Court must determine the proper meaning of the term "solicit" in the context of the restrictive covenant. See Steele Founds., Inc., 937 A.2d at 154 ("[W]hen interpreting a contract, . . . '[t]he first step' is [ ] to determine 'what a reasonable person in the position of the parties would have thought the disputed language meant.'" (second alteration in original) (internal citation omitted)). The parties have not cited, and the Court has not been able to locate, any decisions interpreting the meaning of "solicit" in this context by the District of Columbia Court of Appeals or any other court applying District of Columbia law. And, courts that have addressed the issue under other states' laws have adopted conflicting interpretations. For example, the Fourth Circuit has held "that the plain meaning of 'solicit' requires the initiation of contact." Mona Elec. Grp. v. Truland Serv. Corp., 56 F. App'x 108, 110 (4th Cir. 2003) (applying Maryland law); see Gen. Assur. of Am., Inc. v. Overby-Seawell Co., 893 F. Supp. 2d 761 (E.D. Va. 2012) (concluding that "for purposes of enforcement of nonsolicitation clauses under Georgia law, . . . 'solicitation' of business . . . turns on which party initiated contact"). By contrast, several other courts, including the First Circuit and another member of this Court, have concluded that solicitation does not necessarily require initiating contact with a customer. See Corp. Techs., Inc. v. Harnett, 731 F.3d 6, 10–12 (1st Cir. 2013) (applying Massachusetts law and concluding that "the identity of the party making initial contact is just one factor among many that the trial court should consider in . . . [defining] solicitation . . . in a given case"); see also Wells Fargo Ins. Servs. USA, Inc. v. McQuate, 276 F. Supp. 3d 1089, 1111 (D. Colo. 2016) ("find[ing] that, under Colorado law, conduct may fall within the definition of 'solicit' and 'solicitation' even in the absence of [the] [d]efendants making the initial contact with [the plaintiff's] client or customer"); Wachovia Ins. Servs., Inc. v. Hinds, Civ. Action No. WDQ-07-2114, 2007 WL 6624661, at *6 (D. Md. Aug. 30, 2007) (applying Maryland law and

concluding that "[e]ven if [the employee] did not initiate contact with [her former employer's client], she may have actively solicited them"); FCE Benefit Adm'rs, Inc. v. George Wash. Univ., 209 F. Supp. 2d 232, 234 (D.D.C. 2002) (not identifying the state law being applied and concluding that an employee violated a prohibition against soliciting her client's customers because, "[e]ven though she was initially contacted by [a customer] . . . , she assumed an active role in [the customer's] decision-making process").[5]

The Court concludes that the plain meaning of "solicit" does not necessarily require the soliciting party to initiate contact. Common dictionary definitions of "solicit" support this interpretation, as they explicitly include conduct that does not require an actor to initiate contact or even make a request, but only require "seeking to obtain something" or making "[a]n attempt or effort to gain business." Black's Law Dictionary 1607–08 (10th ed. 2014); see also Solicit, Merriam-Webster Dictionary Online, https://www.merriam-webster.com/dictionary/solicit (last visited Mar. 19, 2019) (defining "solicit" to include "to urge (something, such as one's cause) strongly"). Notably, Mukerji appears to concede that the plain meaning of "solicit" is not limited to circumstances in which an employee initiated contact with a potential customer. See Mukerji's Reply at 14 (arguing that "[c]ourts that found solicitation . . . uniformly require . . .

---

[5] The Court appreciates that "because the District of Columbia was carved out of Maryland and derived its common law from that State[,] Maryland decisions, although not binding, are entitled to particular weight in this Court[.]" Delahanty v. Hinckley, 845 F.2d 1069, 1071 (D.C. Cir. 1988). However, this Court has been unable to locate any Maryland Court of Appeals decision on the plain meaning of "solicit" in a restrictive covenant. Moreover, although Maryland's intermediate appellate court, in a nonprecedential opinion, and the Fourth Circuit, in an opinion applying Maryland law, have concluded that "the plain meaning of 'solicit' requires the initiation of contact," AMP Sys., LLC v. Aertight Sys., Inc., No. 1611 Sept. Term 2015, 2016 WL 7079621, at *7 (Md. Ct. Spec. App. Dec. 5, 2016) (quoting Mona Elec. Grp., 56 F. App'x at 110); see Mona Elec. Grp., 56 F. App'x at 110, at least one Maryland district court decision applying Maryland law questions that conclusion, see Wachovia Ins. Servs., Inc., 2007 WL 6624661, at *6 (acknowledging Mona Electric Group but concluding that "[e]ven if [the employee] did not initiate contact with [her former employer's client], she may have actively solicited them"). In any event, the Court does not find it appropriate to assign significant weight to decisions concluding that "solicit" requires initiation of contact because, as explained infra, common dictionary definitions of the term "solicit" do not support that conclusion.

20

initiating the customer contact, disclosing confidential former employer information, misrepresenting or omitting competitive information, meeting with the customer after the proposal and before the award, socializing with the customer[,] or otherwise taking proactive steps that went beyond responding to the proposal" (emphasis added)).

Adopting the ordinary meaning of "solicit," the Court concludes that a reasonable jury must conclude that Mukerji solicited Akin to obtain the Akin Project. Mukerji does not dispute that he communicated directly with Whelan regarding HBR's bids for the Information Governance and NetDocuments Conversion Projects. Specifically, Mukerji does not dispute that from November 27, 2016, through December 1, 2016, he exchanged e-mails with Whelan regarding "information [HBR] needed for the [Information Governance] proposal," and that, on December 1, 2016, he "sp[o]k[e] with [Whelan] about the [Information Governance] proposal." Mukerji's Reply to eSentio's Facts ¶ 45, at 20. Additionally, Mukerji does not dispute that, on his December 1, 2016 phone call with Whelan, he also spoke with Whelan about the NetDocuments Conversion Project and Whelan "asked him 'to consider and come up with what aspects [HBR] would want to take on for the [NetDocuments Conversion] [P]roject.'" Id. (quoting HBR's Mot., Ex. 21 (███████████████████████████████) at HBR 000226). As another member of this Court has observed, direct contacts with a restricted client for the purpose of obtaining business from that client "plainly violate" a nonsolicitation provision. Robert Half Int'l Inc. v. Billingham, 315 F. Supp. 3d 419, 432 (D.D.C. 2018) (concluding that an employee "violated [his] non[]solicitation provision . . . by communicating with [prohibited] customers for the purpose of creating business opportunities for his new employer[]"). Moreover, Mukerji does not dispute that he prepared the NetDocuments Conversion Project proposal and participated in the preparation of the Information Governance

Project proposal.  See Mukerji's Mem. at 28 (asserting that "Schmidt . . . asked [ ] Mukerji to prepare [the NetDocuments Conversion Project proposal], which [Mukerji] did"); see also Mukerji's Reply to eSentio's Facts ¶ 45, at 20 (admitting that the record evidence demonstrates that "Mukerji revised and circulated internally a draft of the [Information Governance] proposal requested by Akin" and also "blocked out time on his calendar to plan the proposal that Akin requested for its Net[]Documents [Conversion] [P]roject").  Mukerji also submitted final or pre-final versions of HBR's proposals for both projects directly to Whelan.  See eSentio's Facts ¶ 47; see also Mukerji's Reply to eSentio's Facts ¶ 47 (not disputing that Mukerji submitted the final version of "the proposal Akin requested for Information Governance services"); id. ¶ 45 (admitting that the evidence shows "Mukerji sent a preliminary draft of the [NetDocuments Conversion Project] proposal to . . . Whelan to discuss"); eSentio's Mot., Ex. 41 (E-mail from Rajiv Mukerji to TJ Whelan (Dec. 5, 2016)) at HBR_00000001 (attaching "HBR proposal for Akin [Information Governance] Assessment" and stating: "We'd like to go through the proposal with you at your convenience this week so we can adjust as needed to make sure we've captured all your requirements."); eSentio's Mot., Ex. 28 (E-mail from Rajiv Mukerji to TJ Whelan (Dec. 22, 2016)) at HBR_00001049 (attaching "Akin discussion proposal" for NetDocuments Conversion Project).  These collective actions clearly constitute "attempt[s] or effort[s] to gain business" from Akin, Black's Law Dictionary 1608 (10th ed. 2014), or actions "to urge [HBR's cause] strongly," Solicit, Merriam-Webster Dictionary Online, https://www.merriam-webster.com/dictionary/solicit (last visited Mar. 19, 2019).

Mukerji's counterarguments are unpersuasive.  He cites a number of cases for the proposition that "[c]ourts that f[i]nd solicitation . . . uniformly require . . . initiating customer contact, disclosing confidential former employer information, misrepresenting or omitting

competitive information, meeting with the customer after the proposal and before the award, socializing with the customer[,] or otherwise taking proactive steps that went beyond responding to [a] proposal." Mukerji's Reply at 14. However, for the reasons already explained, the Court cannot agree that initiation of customer contact is required for solicitation, and thus, it rejects as unpersuasive courts' conclusions relying on this proposition. The Court also cannot agree that an employee must take "proactive steps . . . beyond responding to [a] proposal" to violate a nonsolicitation provision, as efforts to prepare and submit a proposal for a client's business fall squarely within the plain meaning of solicit. See Black's Law Dictionary 1608 (10th ed. 2014) (defining "solicitation" to include "[a]n attempt or effort to gain business"). The remaining cases cited by Mukerji do not dictate otherwise, as they simply conclude that "[m]erely accepting business," without taking any other action to obtain it, "does not . . . constitute solicitation." Akron Pest Control v. Radar Exterminating Co., 455 S.E.2d 601, 603 (Ga. Ct. App. 1995) (concluding that a "nonsolicitation agreement could [not] be violated by failing to turn away the business of former customers"); see, e.g., J.K.R., Inc. v. Triple Check Tax Serv., Inc., 736 So. 2d 43, 44 (Fla. Dist. Ct. App. 1999) (concluding that "[t]he words 'call upon, solicit, divert or take away' . . . do not disallow [employees] from accepting former clients who actively seek their assistance," and thus, "affirm[ing] . . . [a] temporary injunction prohibiting [the employees] from contacting former clients, but revers[ing] that portion forbidding them from 'doing business with' former clients"); Harry Blackwood, Inc. v. Caputo, 434 A.2d 169, 170 (Pa. Super. Ct. 1981) (concluding that a nonsolicitation provision did not "preclude [an insurance agent] from any writing of insurance for any of [his former employer's] customers"). And, the decision by another member of this Court in FCE Benefit Administrators, upon which Mukerji relies, does not support the proposition that any or all of the actions listed by Mukerji must be present to find

solicitation. In that case, the Court considered whether an insurance agent breached an agreement with a health insurance benefits company to not "call on, solicit, take away, or attempt to call on, solicit, or take away any of [the company's] customers," 209 F. Supp. 2d at 234, and, in concluding that the agent breached the agreement, it observed that the actions taken by the agent to sell the company's customer a competitor's health insurance benefits plan—including "solicit[ing] alternative price quotes, me[eting] repeatedly with [the customer]'s benefits committee, and [ ] prepar[ing] numerous spreadsheets" — "constituted <u>far more</u> than merely 'accepting . . . business,'" <u>id.</u> at 240 (emphasis added). In any event, Mukerji's direct communications with Whelan regarding the Information Governance Project and NetDocuments Conversion Project proposals would suffice to satisfy any "proactive steps" requirement, as they demonstrate that Mukerji "assumed an active role in [Akin's] decision-making process" with respect to those projects. <u>Id.</u> at 234.

Thus, the Court concludes that the undisputed evidence demonstrates that Mukerji solicited Akin with respect to the Akin Project. Accordingly, the Court concludes that eSentio has demonstrated that Mukerji breached his restrictive covenant as to Akin.

### b. King & Spalding

Mukerji argues that "[t]his Court must enter summary judgment in [his] favor on eSentio's breach of contract claim with respect to King & Spalding" because he "did nothing to obtain the King & Spalding . . . [P]roject," as shown by the fact that he "asked to be walled off from it," Mukerji's Mem. at 24, and that others involved in the bid issued instructions that Mukerji could not be involved, <u>see</u> id. He further argues that "a covenant not to solicit, divert or take away clients does not bar a non-breaching employee from performing work he did not solicit." <u>Id.</u> eSentio responds that "[t]he supposed 'wall' was just a smokescreen to mask

Mukerji's pivotal role, as Mukerji was copied on e[-]mails, and in one e[-]mail provided analysis of HBR's competition" for the King & Spalding Project. eSentio's Reply at 18. Additionally, it argues that the evidence demonstrates that Mukerji "indirectly" solicited King & Spalding by "us[ing] . . . HBR [ ] to place his credentials and experience before the [King & Spalding] decisionmakers." eSentio's Mem. at 20; see id. at 19 (arguing that HBR "solicit[ed] [King & Spalding] on Mukerji's behalf" by "actively pitch[ing] Mukerji as a key member of the [proposed] project team, [and] inform[ing] [King & Spalding] that Mukerji would actually lead the project").

The Court finds that a genuine factual dispute exists with respect to whether Mukerji solicited the King & Spalding Project in violation of the restrictive covenant. Specifically, the Court concludes that a genuine factual issue exists with respect to whether Mukerji advised on and otherwise participated in preparing HBR's bid for the project. For example, as eSentio notes, see eSentio's Reply at 18, evidence in the record demonstrates that HBR employees involved in preparing the King & Spalding bid included Mukerji on several e-mails related to HBR's efforts to obtain the King & Spalding Project. See eSentio's Opp'n to HBR's Mot., Ex. 114 (███████████████████████████████████████) at HBR_00001232–33 (informing Mukerji, Denner, and two others that HBR was "about to get an RFP from King & Spa[]lding on [NetDocuments] services" and identifying firms they would "be competing against"); id., Ex. 112 (███████████████████████████████████) at HBR_00001121 (circulating "updates to the King & Spalding RFP" to Schmidt, copying Mukerji, Mark Denner, and Jorge Arana); id., Ex. 113 (██████████████████████ ██████████████████) at HBR_00001447–48 (informing Mukerji that "Erik didn't do a good job leading the work on" the RFP for the King & Spalding Project, to which Mukerji responded,

"[W]hen is it due? [C]an you and Terry fix?").  And, ███████████████████████

provided his opinion regarding HBR's potential competition for the King & Spalding Project.

See id., Ex. 114 (E-mail from Rajiv Mukerji to Erik Schmidt and Mark Denner (Jan. 10, 2017))

at HBR_00001232 (advising that "Adaptive would be the main [competition], [as] they are

helping A&P and have a good DC presence").  Additionally, ██████████████████████

████████████████████████████████████████████████████ provided

Denner with information regarding eSentio's relationship with King & Spalding.  See id., Ex. 63

(████████████████████████████████████████████████) at

HBR_000005345 (in a discussion regarding the King & Spalding Project and other topics,

Mukerji stating that "eSentio burnt some bridges at [King & Spalding]" and "it's been a few

years since they did any work there," to which Denner responded "good [t]o[] know").  A

reasonable juror could conclude from this evidence that Mukerji ████████████████████

█████████████████████████████████████.

Moreover, other evidence in the record could bolster a reasonable juror's inference that

Mukerji was involved in HBR's efforts to secure the King & Spalding Project.  Specifically,

there exists undisputed evidence in the record that preparation of HBR's proposal required

specialized knowledge of NetDocuments conversions for firms similar in size to King &

Spalding, see eSentio's Facts ¶ 57 (asserting that "[t]he [King & Spalding] RFP required bidders

to identify their specific experience with iManage to NetDocuments conversion and migration in

firms of similar size" and "to answer questions such as . . . how long do you anticipate this

consulting engagement will require?"); see also HBR's Reply to eSentio's Facts ¶ 57; Mukerji's

Reply to eSentio's Facts ¶ 57 (incorporating HBR's response to ¶ 57 of eSentio's Facts), and that

"HBR did not have experience with NetDocuments conversions for AmLaw 100 law firms

██████████████ eSentio's Facts ¶ 58; <u>see</u> HBR's Reply to eSentio's Facts ¶ 58; Mukerji's Reply to eSentio's Facts ¶ 58 (incorporating HBR's response to ¶ 58 of eSentio's Facts). Additionally, evidence in the record demonstrates that ███████████████████████████ ████████████████████████████████, <u>see</u> eSentio's Facts ¶ 60 (███████████ ████████████████████████████████████████████ ██████████████████████████████████ ██████████████████); HBR's Reply to eSentio's Facts ¶ 60; Mukerji's Reply to eSentio's Facts ¶ 60 (incorporating HBR's response to ¶ 60 of eSentio's Facts). Based on this evidence, as well as ████████████████████████████████████████ ██████████████████████████ a reasonable juror could infer that Mukerji was involved, either directly or indirectly, in HBR's efforts to obtain the King & Spalding Project, which, as already explained, is sufficient to constitute solicitation. <u>See</u> <u>Black's Law Dictionary</u> 1608 (10th ed. 2014) (defining "solicitation" to include "[a]n attempt or effort to gain business").

Mukerji's counterarguments are unpersuasive. For the reasons already explained, the Court disagrees with Mukerji that, "even if . . . [he] had participated in responding to the [King & Spalding] proposal, . . . his covenant not to solicit, divert or take away a client allowed him to do so." Mukerji's Reply at 14–15. Moreover, ███████████████████████████████ ██████████████████████████████████████ ██████████████████████████████████████ ██████████████████████████████████████ █████████████████████████████████████ is not dispositive, as the plain language of Mukerji's restrictive covenant does not require direct contact

between Mukerji and the restricted client, but only "any action to, directly or indirectly, solicit" the client.  eSentio's Mot., Ex. 14 (Employment Agreement) § 3.8.  Furthermore, although Mukerji claims that █████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████ <u>see</u> Mukerji Aff. ¶ 39, ██████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████████████████████████ <u>see,</u> <u>e.g.</u>, HBR's Mot., Ex. 2 (Deposition of Rajiv Mukerji (May 31, 2018) ("Mukerji Dep.")) 237:2–3 (███████████████████████████████████████); <u>id.</u>, Ex. 33 (Declaration of Erik Schmidt (July 18, 2018)) ¶ 13 (███████████████████████████████████ ███████████████████████████████), this evidence also only creates a factual issue not appropriate for the Court to resolve on a motion for summary judgment.

Thus, the Court concludes that a reasonable juror could conclude from the evidence in the record that Mukerji solicited King & Spalding with respect to the King & Spalding Project. Accordingly, summary judgment on eSentio's breach of contract claim against Mukerji as to King & Spalding is inappropriate.  See <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 330 n.2 (1986) ("If . . . there is any evidence in the record from any source from which a reasonable inference in the [nonmoving party's] favor may be drawn, the moving party simply cannot obtain a summary judgment[.]" (alteration in original) (citation omitted)).

### 4.  Damages

eSentio argues that ███████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████

the [d]efendants' conduct, Akin [and King & Spalding] awarded the Akin [and King & Spalding] Project[s] to HBR," eSentio's Mem. at 22, and thus, eSentio is entitled to "the profits [it] would have received had the work been performed by [it] instead of [HBR]," id. (quoting Mercer Mgmt. Consulting, 920 F. Supp. at 238). Additionally, eSentio argues that Mukerji's breach caused it other damages resulting from HBR's acquisition of the Akin and King & Spalding Projects, "including but not limited to the diminution of the value of its investment in its NetDocuments expertise and the associated 'head start' advantage secured by HBR." eSentio's Opp'n to Mukerji's Mot. at 6. Finally, eSentio argues that, "even if eSentio were unable to prove any quantifiable damages at all, it could still maintain its breach of contract . . . claims," eSentio's Opp'n to HBR's Mem. at 20, because "[f]rom every breach of contract the law will imply at least nominal damages," id. (citation and internal quotation marks omitted), and "the breach of a restrictive covenant carries with it the potential for injunctive relief," eSentio's Reply at 13 n.8. Mukerji responds that "eSentio has no evidence that [ ] Mukerji engaged in conduct that caused eSentio to lose the [Akin and King & Spalding] bids" because "the evidence[] . . . shows that eSentio did that by itself." Mukerji's Reply at 17.

The Court agrees with eSentio that any breach by Mukerji would entitle eSentio to at least nominal damages for the breach. As this Circuit has observed, "the settled rule in the District [of Columbia] is that '[e]ven where monetary damages cannot be proved, a plaintiff who can establish a breach of contract is entitled to an award of nominal damages.'" Alston v. Flagstar Bank, FSB, 609 F. App'x 2, 3 (D.C. Cir. 2015) (second alteration in original) (quoting Wright v. Howard Univ., 60 A.3d 749, 753 (D.C. 2013)). And, "it is settled in th[is] District that nominal damages can suffice" to establish a prima facie case for breach of contract. Alemayehu v. Abere, 298 F. Supp. 3d 157, 169 (D.D.C. 2018) (citing Alston, 609 F. App'x at 3). Thus,

because the Court has concluded that Mukerji breached the restrictive covenant as to Akin, it must also conclude that eSentio has satisfied the damages element of its breach of contract claim with respect to Akin. Additionally, because the Court has concluded that a reasonable juror could find that Mukerji also breached the restrictive covenant as to King & Spalding, the Court must conclude that a reasonable juror could also find that eSentio has satisfied the damages element of its breach of contract claim with respect to King & Spalding.[6]

### 5. Whether eSentio's Alleged Breach of Its Agreement to Pay Mukerji an Annual Performance Bonus Excuses Any Breach by Mukerji

Mukerji finally argues that genuine issues of fact preclude summary judgment as to eSentio's breach of contract claims because a "reasonable jur[or] can conclude that eSentio breached its agreement to pay [ ] Mukerji an annual performance bonus" and "such [a] finding would excuse [his] non-performance, if any, of his restrictive covenant." Mukerji's Opp'n at 15. eSentio does not explicitly respond to this argument, aside from disputing that it breached Mukerji's Bonus Provision. See generally eSentio's Opp'n to Mukerji's Mot.; eSentio's Reply. However, even assuming that Mukerji is correct that a reasonable juror could conclude that eSentio breached the Bonus Provision, which the Court addresses later in this Memorandum Opinion, see Part III.D, infra, the Court must reject his argument that such a breach would justify any subsequent breach by him of the restrictive covenant. As the District of Columbia Circuit has explained, "[m]aterial breach entitles the injured party to an election of remedies, including rescission or termination of the contract, not a license to commit torts or otherwise breach the

---

[6] Because the Court concludes that eSentio's entitlement or potential entitlement to nominal damages satisfies or potentially satisfies the damages element of its breach of contract claims, and because eSentio seeks summary judgment only as to liability, see eSentio's Mot at 1, the Court need not at this time conduct further inquiry into whether eSentio is entitled to the monetary damages it claims or injunctive relief. In any event, Mukerji's arguments that eSentio is not entitled to monetary damages resulting from eSentio's loss of the Akin and King & Spalding Projects, see Mukerji's Reply at 17, raise genuine factual issues precluding summary judgment as to these damages for the reasons explained in more detail in Part III.B, infra.

contract." Ashcraft & Gerel v. Coady, 244 F.3d 948, 951 (D.C. Cir. 2001). And, although the

Circuit in Ashcraft found that an employee "would be entitled to introduce evidence of [his]

firm's prior material breach as part of his defense to the firm's claims that he breached the

employment contract," id. at 952–53, it recognized only that such evidence would be relevant to

persuade "a jury . . . [to] conclude that the firm's other [relevant] conduct was to be viewed in a

different light," id. at 954. Here, Mukerji fails to explain how the facts underlying eSentio's

alleged breach of the Bonus Provision create a genuine issue of material fact with respect to

eSentio's claim that Mukerji violated the restrictive covenant. See Mukerji's Opp'n at 15

(arguing only that eSentio's alleged prior breach "would excuse [his] non-performance"). Thus,

the Court cannot conclude that any alleged prior breach of the Bonus Provision by eSentio

creates a genuine issue of material fact precluding summary judgment as to eSentio's breach of

contract claim.

In sum, the Court concludes that eSentio is entitled to summary judgment in its favor as

to liability on its breach of contract claim against Mukerji with respect to Akin, and thus, the

Court will grant eSentio's motion for summary judgment and deny Mukerji's cross-motion for

summary judgment as to this claim. However, the Court concludes that genuine issues of

material fact preclude summary judgment as to eSentio's breach of contract claim against

Mukerji with respect to King & Spalding, and thus, the Court will deny eSentio's and Mukerji's

motions for summary judgment as to this claim.

**B.      eSentio's Tortious Interference with Contract Claim (Count II)**

eSentio and HBR both move for summary judgment on Count II of the Complaint, which

alleges that HBR tortiously interfered with Mukerji's performance of the restrictive covenant by

"intentionally permit[ting] and caus[ing] Mukerji to breach his contractual obligations to

eSentio." Compl. ¶ 56.  "To recover in tort for intentional interference with contractual relations, the plaintiff must prove four elements: '(1) existence of a contract, (2) knowledge of the contract, (3) intentional procurement of its breach by the defendant, and (4) damages resulting from the breach.'" Sorrells v. Garfinckel's, Brooks Bros., Miller & Rhoads, Inc., 565 A.2d 285, 289 (D.C. 1989) (quoting Alfred A. Altimont, Inc. v. Chatelain, Samperton & Nolan, 374 A.2d 284, 288 (D.C. 1977)); see Restatement (Second) of Torts § 766 (Am. Law Inst. 1979) ("One who intentionally and improperly interferes with the performance of a contract . . . between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.").[7]  "'Once a prima facie case has been established,' it becomes the defendant's burden to prove 'that . . . [its] conduct was legally justified or privileged.'" Sorrells, 565 A.2d at 289–90 (quoting Alfred A. Altimont, Inc., 374 A.2d at 288). "In other words, a trier of fact may find for the plaintiff who presents a prima facie case unless the defendant proves that . . . [its] conduct was justified or privileged." Id. at 290.  The Court will address eSentio's tortious interference with contract claim as to Akin and King & Spalding separately.

### 1. Akin

HBR argues that

> [t]here is no evidence in the record to establish the second, third, and fourth elements of [eSentio's] claim . . . [as to Akin] because: (1) HBR did not know that Mukerji's restrictive covenant applied to Akin and thus did not intentionally procure Mukerji's purported breach of the Employment Agreement; (2) HBR's conduct in bidding for the Akin [P]roject was not improper; and (3) eSentio did not

---

[7] The Court notes that it need not address the first element of eSentio's tortious interference with contract claim—the existence of a valid contract—because, for purposes of summary judgment, HBR does not dispute that Mukerji's Employment Agreement and its restrictive covenant are valid.  See HBR's Opp'n at 4 n.4.  In any event, the Court has concluded that the restrictive covenant is enforceable.  See Part III.A.1, supra.

suffer any damages because it would not have been awarded the Akin contract, regardless of HBR's actions.

HBR's Opp'n at 4. It further argues that it "could not have intentionally procured a breach of the restrictive covenant because Mukerji did not breach the restrictive covenant." HBR's Reply at 4. The Court must reject HBR's last argument based on the Court's conclusion that Mukerji did breach the restrictive covenant as to Akin. However, it will address HBR's remaining arguments in turn.

### a. Knowledge

HBR argues that "there is no evidence to support the assertion that [it] had knowledge that Mukerji's restrictive covenant with eSentio applied to soliciting work from [Akin]" because "all of the evidence . . . demonstrates that HBR took affirmative steps to ascertain if Mukerji's restrictive covenant applied to [Akin] and was advised by both Mukerji and [Akin] that it did not." HBR's Mem. at 8. eSentio responds that "HBR cannot escape tort liability on the grounds that it did not 'understand' the contract or did not 'believe' its actions constituted a breach" because the knowledge element "is satisfied when the defendant knew of the existence of the contract itself" and "[a] plaintiff is not required to prove that the defendant understood the legal significance of its actions." eSentio's Opp'n to HBR's Mot. at 3. eSentio further argues that the undisputed facts "establish th[is] [ ] element as a matter of law" because "HBR knew of Mukerji's contractual obligations, knew that he was prohibited from taking any action, directly or indirectly, to solicit, divert or take away 'Clients' and 'Prospects' as those terms are defined in the [Employment] Agreement, and knew that those restrictions applied for one year after his eSentio employment ended." Id. at 4.

The Court finds that evidence in the record creates a genuine issue of material fact as to whether HBR had the requisite knowledge of Mukerji's Employment Agreement. The District

of Columbia Court of Appeals "ha[s] repeatedly stated that the 'law of tortious interference with business or contractual relationships derives from the Restatement (Second) of Torts.'" Whitt v. Am. Prop. Constr., P.C., 157 A.3d 196, 203 (D.C. 2017) (citation omitted). As eSentio correctly notes, see eSentio's Opp'n at 3, the Restatement (Second) of Torts provides the following on the issue of knowledge:

> To be subject to liability [for intentional interference with performance of a contract], the actor must have knowledge of the contract with which he is interfering and of the fact that he is interfering with the performance of the contract. . . . But it is not necessary that the actor appreciate the legal significance of the facts giving rise to the contractual duty, at least in the case of an express contract. If he knows those facts, he is subject to liability even though he is mistaken as to their legal significance and believes that the agreement is not legally binding or has a different legal effect from what it is judicially held to have.

Restatement (Second) of Torts § 766 cmt. i.

Here, the undisputed evidence demonstrates . See HBR's Reply to eSentio's Facts ¶ 82 (not disputing that "[a]t the time it prepared and submitted its response to the [ ] RFP for the Akin Project, HBR had knowledge that Mukerji had executed the [Employment] Agreement and that the Agreement included specific restrictive covenants"). Additionally, a reasonable juror could find that HBR knew about the facts establishing that Akin qualified as a client or prospect under Mukerji's Employment Agreement, and thus, for purposes of eSentio's tortious interference with contract claim, knew that Mukerji's restrictive covenant applied to Akin. See Restatement (Second) of Torts § 766 cmt. i. Specifically, evidence in the record demonstrates that, on December 27, 2016, Whelan informed Erik Schmidt and Mukerji that eSentio performed work for Akin as late as April 2015, see eSentio's Mot., Ex. 98 ⬛⬛⬛⬛ ⬛⬛⬛⬛⬛⬛) at HBR_00000517, which, as already explained, establishes that Akin was a "client" covered by the restrictive covenant, see Part III.A.1, supra.

Although HBR argues that this evidence "cannot, as a matter of law and common sense, impute liability to HBR because it is undisputed that HBR had already submitted its [NetDocuments Conversion Project] proposal to Akin[] . . . on December 22, 2016," HBR's Reply at 3, HBR's position conflicts with the undisputed fact that HBR did not "submit[] its statement of work for [Akin's] NetDocuments [Conversion] [P]roject" until December 28, 2016, HBR's Facts ¶ 56; see eSentio's Reply to HBR's Facts ¶ 56. In any event, a reasonable juror could conclude that this same e-mail also demonstrates that Schmidt knew facts establishing that Mukerji's restrictive covenant precluded Mukerji from working on the Akin Project prior to December 27, 2016, as Whelan asked Schmidt, "Do you still think this will be a problem with our working with Rajiv[?]" eSentio's Mot., Ex. 98 (███████████████████████████████ ███████) at HBR_00000517 (emphasis added). Thus, the Court concludes that a reasonable juror could find that HBR had the requisite knowledge of Mukerji's restrictive covenant and the facts giving rise to his contractual duty not to solicit Akin.

The cases cited by HBR in support of its positions are distinguishable from the facts in this case. HBR relies on Tuxedo Contractors, Inc. v. Swindell-Dressler Co. for the proposition that a defendant lacks the requisite knowledge of a contract if it is "entitled to rely on assurances . . . that there would be no contractual conflicts." HBR's Opp'n at 6 (citing 613 F.2d 1159, 1163–64 (D.C. Cir. 1979)). However, this Circuit's holding in that case was based on the principle that "a party, when told by a prospective client that there is no conflicting contract, cannot be held to have knowledge that a binding agreement does in fact exist, at least in the absence of independent evidence of such knowledge." Tuxedo Contractors, 613 F.2d at 1164. Here, HBR asserts that it relied on assurances from Mukerji, not Akin. See HBR's Opp'n at 6. Furthermore, although HBR claims that Akin "advised" it that Mukerji's restrictive covenant did

not apply to Akin, HBR's Mem. at 8, the record evidence cited to support this assertion shows that Akin did not do so, but merely informed HBR that eSentio last performed services for HBR in April of 2015 and sought HBR's advice regarding whether the restrictive covenant applied, see eSentio's Mot., Ex. 98 (██████████████████████████████████████ ██████) at HBR_00000517 (stating that "the last invoice that [Akin] received from eSentio was from April 2015" and asking, "Do you still think that this will be a problem with our working with Rajiv since almost two years have passed?"). In any event, the evidence already discussed, including the e-mail from Whelan suggesting that at some point Erik Schmidt of HBR believed that there "w[ould] be a problem with [Akin] working with Rajiv," id., Ex. 98 (███████████████ ██████████████████████████████████████) at HBR_00000517, constitutes "independent evidence of [HBR's] knowledge" of the contract and the facts giving rise to Mukerji's duty not to solicit Akin, see Tuxedo Contractors, 613 F.2d at 1164. Mercer Management Consulting, another case on which HBR relies, see HBR's Opp'n at 6, is also distinguishable. In that case, the court concluded that, "during the time of [the defendants'] interference with [the plaintiff's] clients, [they] apparently did not believe they were under any restrictions against competitive activities," 920 F. Supp. 219, 239 (D.D.C. 1996) (emphasis added), based on their testimony "that they had forgotten about the agreements," id. at 227, and thus, they could not have "acted with the level of wrongful intent to constitute tortious interference," id. at 239. Here, it is undisputed that ██████████████████████████ ██████████████████████████████████████████████████████████████ ████████████████. Therefore, the cases cited by HBR do not affect the Court's conclusion that a reasonable juror could find that HBR possessed the requisite knowledge of Mukerji's Employment Agreement and the facts giving rise to Mukerji's duty not to solicit Akin.

### b. Intentional Procurement of a Breach

HBR argues that it "could not have intentionally procured [a] breach [by Mukerji] because it had no knowledge that Mukerji was violating his restrictive covenant." HBR's Mem. at 8. It further argues that "even if [Akin] constituted a 'client' or 'prospect' under Mukerji's restrictive covenant, Mukerji did not breach his contract because he did not 'solicit, divert, or take away' [Akin] from eSentio." Id. Finally, HBR argues that eSentio's tortious interference with contract claim must fail because "eSentio has not shown that HBR's conduct was improper," as "HBR relied on Mu[k]er[j]i's representations [that Akin was not subject to the restrictive covenant] and there is no evidence that HBR's motive in submitting the proposal was to interfere with Mu[k]er[j]i's Employment Agreement." HBR's Opp'n at 7.

eSentio responds that █████████████████████████████████ ███████████████████████████████ it] assigned Mukerji to be the lead on the Akin [P]roject, tasked him with writing and contributing to the bid for the Akin work, and required him to interface directly with Akin decision-makers on HBR's behalf to pitch its services—even after learning that Akin fell squarely within the scope of eSentio prohibited 'clients' covered by the [restrictive covenant]." eSentio's Mem. at 26 (internal citation omitted). eSentio further argues that it "is not required to prove 'impropriety' to establish a claim of tortious interference with contract under [District of Columbia] law" because that burden only arises if "the defendant meets [its] burden of proof" of establishing that its "conduct was 'legally justified,'" which it contends HBR has failed to do here. eSentio's Reply at 10. Finally, eSentio argues that even if HBR had satisfied that burden, its "defense would fail, because the undisputed facts demonstrate that HBR's interference with Mukerji's [Employment] Agreement, was 'improper,'" id.,

including evidence demonstrating that HBR "intentionally misled Akin about the application of Mukerji's [Employment] Agreement" to Akin, id. at 11.

As the Restatement instructs, interference with performance of a contract must be both "intentional[] and improper[]." Restatement (Second) of Torts § 766. To satisfy the intentional requirement, a plaintiff may show that a defendant acted "with th[e] purpose or desire" to interfere, id. § 766 cmt. j, or that "the actor 'kn[e]w[] that the interference [wa]s certain or substantially certain to occur as a result of his action,'" Whitt, 157 A.3d at 202 (quoting Restatement (Second) of Torts § 766 cmt. j). As to the "improper" requirement, the District of Columbia Court of Appeals has instructed that "[t]he Restatement's reference to 'improper' conduct is simply another way of saying that the alleged tortfeasor's conduct must be legally justified." Sorrells, 565 A.2d at 290. Thus, under the burden-shifting framework in Sorrells, the plaintiff need not demonstrate that interference is improper to establish a prima facie case of tortious interference with contract; rather, "[o]nce a prima facie case has been established, it becomes the defendant's burden to prove that [its] conduct was" not improper, i.e., that it was "legally justified or privileged." Id. (internal quotation marks and citation omitted); see NCRIC, Inc. v. Columbia Hosp. for Women Med. Ctr., Inc., 957 A.2d 890, 893 (D.C. 2008) ("Wrongful conduct is not an element of a prima facie case of tortious interference under District of Columbia law.").

Here, the Court finds that evidence in the record creates a genuine factual issue regarding whether HBR intentionally procured Mukerji's breach of the restrictive covenant with respect to Akin. As already explained, the Court concludes that evidence in the record demonstrates that Mukerji breached his restrictive covenant by soliciting Akin's business, including contacting Akin directly with respect to HBR's proposal for the Akin Project and preparing and submitting

HBR's bid.  See Part III.A.1, supra.  The Court further concludes that a reasonable juror could

find that HBR induced Mukerji to take these actions, as HBR included Mukerji on the Akin

Project team and encouraged him to communicate directly with Whelan regarding HBR's

proposal.  See, e.g., eSentio's Mot., Ex. 55 (████████████████████████████████████

███████████████████████████████) at HBR_00001342–43 (asking that Mukerji or Fashola

reply to an e-mail from Whelan regarding the Information Governance Project); see also id., Ex.

54 (███████████████████████████████████████) at HBR_00001336

(Mukerji stating, "[w]e had a good call with Akin – they need a SOW," to which Ryan responds,

"Glad to hear it"); id., Ex. 53 (███████████████████████████████

████) at HBR_00001299 ( "thank[ing Mukerji] for connecting with [Whelan]" regarding the

Information Governance Project█████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████ a reasonable juror could also conclude that HBR

"kn[e]w that interference [with the covenant] [wa]s certain or substantially certain to occur as a

result of [its] action."  Whitt, 157 A.3d at 202.  Based upon this evidence, the Court must

conclude that a reasonable juror could find that HBR acted with the intent necessary to establish

a tortious interference with contract claim.  See Onyeoziri v. Spivok, 44 A.3d 279, 288 (D.C.

2012) (concluding that a plaintiff "presented evidence in support of" the defendants' intent

sufficient to make out a prima facie case of tortious interference with contract where the

defendants "acted with the knowledge that they were impeding [the plaintiffs'] ability to perform

[his] contract").  Accordingly, the Court finds that a genuine factual dispute exists with respect to

whether HBR intentionally induced Mukerji to breach his restrictive covenant as to Akin.  See

Cooke v. Griffiths-Garcia Corp., 612 A.2d 1251, 1258 (D.C. 1992) ("Summary judgment is inappropriate where questions of intent are at issue.").

HBR's counterarguments are unpersuasive. Because the Court has concluded that a reasonable juror could find that HBR had knowledge of the facts giving rise to Mukerji's contractual duty with respect to Akin, see Part III.B.1.a., supra, and that Mukerji violated his restrictive covenant as to Akin, see Part III.A, supra, the Court must reject HBR's arguments that it "could not have intentionally procured the breach because it had no knowledge that Mukerji was violating his restrictive covenant" and because "Mukerji did not . . . 'solicit, divert, or take away' [Akin] from eSentio," HBR's Mem. at 8.

The Court must also reject HBR's argument that "eSentio has not shown that HBR's conduct was improper." HBR's Opp'n at 7. As the District of Columbia Court of Appeals has instructed, "[w]rongful conduct is not an element of a prima facie case of tortious interference under District of Columbia law." NCRIC, Inc., 957 A.2d at 893. Thus, "[i]nstead of the plaintiff bearing the burden of proving that the defendant's conduct was wrongful, it is the defendant who bears the burden of proving that it was not." Id. at 901. And, HBR has not established as a matter of law that its conduct was not improper. A "legal justification or privilege" defense "is [ ] narrow [in] scope[] . . . and protects the actor only when (1) he has a legally protected interest, and (2) in good faith asserts or threatens to protect it, and (3) the threat is to protect it by appropriate means." Id. (quoting Restatement (Second) of Torts § 773). HBR has made no attempt to identify a "legally protected interest" to support such a defense, and the Restatement instructs that an interest in competition alone will not suffice to defeat a tortious interference with contract claim. See Restatement (Second) of Torts § 768 cmt. h ("The rule that competition is not an improper interference . . . does not apply to inducement of breach of contract."). Thus,

HBR has failed to demonstrate that its conduct was not improper, and consequently, eSentio need not prove that HBR's conduct was improper. See Sorrells, 565 A.2d at 290.

Finally, HBR's assertion that it relied on Mukerji's representations regarding his contractual obligations, see HBR's Opp'n at 7, "does not necessarily insulate it from liability because its reliance must be reasonable," Cooke, 612 A.2d at 1258. Here, because HBR admits that it knew of Mukerji's restrictive covenant and, indeed, had a copy of it, and evidence in the record demonstrates that it also was aware of facts establishing that Akin was covered by the restrictive covenant, a reasonable juror could conclude that HBR's reliance on Mukerji's representations was not reasonable. See id. (concluding that a defendant's reliance on an attorney's incorrect representations regarding a contract were not reasonable based on facts within the defendant's knowledge). Thus, the Court concludes that a genuine factual issue exists as to whether HBR intentionally induced Mukerji to breach his restrictive covenant as to Akin.

### c.    Damages

HBR finally argues that "eSentio cannot show that it suffered damages as a result of HBR's alleged interference" "because any 'damages' are fairly attributable to eSentio's own acts: not properly scoping work per Akin's request." HBR's Opp'n at 8. Specifically, it argues that, "[i]n light of the evidence showing that eSentio's proposal was not what Akin was looking for[,] . . . eSentio cannot credibly claim that . . . it would have likely been selected for the Akin [P]roject but for HBR's alleged interference." Id. eSentio responds that "whether eSentio would have won the Akin Project, and the amount of damages that flow therefrom, is a question for the jury," and, in any event, "the undisputed facts give eSentio a strong likelihood of prevailing on

this component of the damages." eSentio's Reply at 13.[8]

The Court concludes that summary judgment for eSentio on its claim for damages flowing from its loss of the Akin Project is inappropriate due to the existence of genuine factual issues regarding whether eSentio would have acquired the Akin Project absent HBR's alleged interference. On the one hand, HBR has identified evidence that could a lead a reasonable juror to conclude that eSentio would not have been awarded the Akin Project. For example, it is undisputed that eSentio's bid was significantly higher in cost than the other three bids submitted to Akin. See HBR's Facts ¶¶ 35, 57, 59–60 (asserting that eSentio's proposal estimated costs of $1,514,250, while HBR, Fireman & Company, and Kraft and Kennedy submitted proposals estimating costs of $161,920, $156,750, and $115,000, respectively); see also eSentio's Reply to HBR's Facts ¶¶ 35, 57, 59–60. Additionally, Whelan testified that he perceived eSentio's proposal as too broad in scope, see, e.g., HBR's Facts ¶ 38 (quoting Whelan's testimony that "there were several items in [the proposal] that weren't necessarily NetDocuments-related"), and that he had "the sense that [eSentio] w[as not] listening to [Akin]," HBR's Mot., Ex. 10 (Deposition of TJ Whelan (July 9, 2018) ("Whelan Dep.")) 116:16. Furthermore, Whelan also testified that he had received negative references regarding eSentio's work. See HBR's Facts ¶ 33 ("Whelan recalled that . . . Finnegan and Henderson had a negative experience with eSentio

---

[8] eSentio also claims that "other damages are available" for its tortious interference with contract claim, namely, "damages suffered by eSentio as a result of th[e] 'head start' advantage" gained by HBR due to winning the Akin Project, including "eSentio's loss of its status as a market leader and the lost value of its NetDocuments investment." eSentio's Reply at 11–12. However, for several reasons the Court need not address whether eSentio is entitled to these damages to resolve the parties' motions for summary judgment. First, the Court has already concluded that genuine issues of material fact preclude summary judgment for eSentio on its tortious interference with contract claim. Second, the Court cannot find that HBR is entitled to summary judgment as to these damages because its only argument for why these damages are unavailable relies on its position that eSentio "cannot prove that it would have been awarded the [Akin and King & Spalding] [P]roject[s] if HBR was not involved," HBR's Reply at 8, which is an assertion the Court has concluded is subject to a genuine factual dispute.

related to []billing.”); see also id. ¶ 34 (“Whelan also received a negative reference from the law firm Baker Donelson regarding eSentio[’s] []billing[.]”),

On the other hand, eSentio has identified evidence that could lead a reasonable juror to conclude that eSentio would have prevailed on its bid for the Akin Project but for HBR’s interference.  For example, it is undisputed that “Mukerji was the deciding factor in [Akin’s] selection” of HBR for the Akin Project, eSentio’s Facts ¶ 72; see HBR’s Reply to eSentio’s Facts ¶ 72; eSentio’s Mot., Ex. 23 (Whelan Dep.) 48:12–16 (agreeing that “if [ ] Mukerji had not gone to HBR, [Whelan] would not have considered [HBR] for the NetDoc[uments] conversion piece”), which could lead a reasonable juror to conclude that “[h]ad Mukerji not been an integral part of the HBR proposal effort[,] Akin would not have selected HBR for the work,” eSentio’s Reply at 13 (emphasis omitted).  Furthermore, eSentio identifies evidence suggesting that the cost of its bid was not disqualifying, as it asserts that the cost was based on “a number of services and optional services,” eSentio’s Reply to HBR’s Facts ¶ 35, and Akin admits that if it had not selected HBR, it “would have re-engaged eSentio” and “may have selected some of the services from eSentio’s ‘menu’ [of] services,” HBR’s Facts ¶ 65; see HBR’s Mot., Ex. 10 (Whelan Dep.) 211:13–17 (testifying that he “most likely” “would [ ] have provided eSentio with an opportunity to discuss the menu of value-added services” in its bid).  Indeed, a reasonable juror could conclude from Whelan’s testimony that Akin viewed eSentio as the only viable alternative to HBR.  See eSentio’s Mot., Ex. 109 (Whelan Dep.) 32:10–14 (agreeing that Fireman & Company and Kraft and Kennedy “fell out of consideration” due to “not having done a large NetDoc[uments] cutover and other reasons”); see also id., Ex. 109 (Whelan Dep.) 33:9–14 (agreeing that “[e]Sentio and HBR [we]re the final vendors under consideration”).

Additionally, eSentio has identified evidence that could lead a reasonable juror to conclude that eSentio was the vendor most qualified to perform the work, or even the only vendor qualified to perform the work. Specifically, it is undisputed that as of the time of the Akin Project bidding, eSentio had "handled at least [seventeen] NetDocuments [c]onversion projects and related NetDocuments engagements," including "[e]ight . . . at AmLaw 100 firms," eSentio's Facts ¶ 67; see HBR's Reply to eSentio's Facts ¶ 67, whereas "HBR had not performed [or bid on] a NetDocuments conversion project for even one AmLaw 200 firm, and . . . had performed NetDocuments work for only one smaller firm," eSentio's Facts ¶ 66; see HBR's Reply to eSentio's Facts ¶ 66. Indeed, HBR admitted that it "did not have experience with NetDocuments conversions for AmLaw 100 law firms without Mukerji," eSentio's Facts ¶ 58; see HBR's Reply to eSentio's Facts ¶ 58; eSentio's Mot., Ex. 10 (Affidavit of Thomas Gaines (July 17, 2018) ("Gaines Aff.")) ¶ 22 ("HBR[] [ ] did not have established NetDocuments experience with AmLaw 100 law firms before hiring [ ] Mukerji."). Additionally, eSentio identified evidence demonstrating that individuals in the industry, including King & Spalding's Chief of Information Services Strategy and Office Integration, eSentio's Mot., Ex. 10 (Gaines Aff.) ¶ 3, who "was on the selection committee for th[e] [King & Spalding] [P]roject," id., Ex. 10 (Gaines Aff.) ¶ 20, believed that "eSentio was a leader in the Document Management space and [in] NetDocuments in particular," id., Ex. 10 (Gaines Aff.) ¶ 7 ("In 2016, it was my impression from talking to colleagues and attending industry events that eSentio had more experience with NetDocuments implementations than any other vendor for AmLaw 100 firms like King & Spalding and Akin . . . . To my knowledge, eSentio was the only consultancy with AmLaw 100 experience with NetDocuments and had developed deep expertise. This evaluation was shared by other IT colleagues and CIOs from other AmLaw 100 firms."); id. Ex. 32

(████████████████████████) at LTG – 295 (quoting the NetDocuments CEO as saying that "eSentio is an important part of NetDocuments['] emergence as the leader in cloud based Document Management and we are proud to work closely with the [f]irm"). This evidence creates a genuine factual issue as to whether eSentio would have been awarded the Akin Project absent HBR's alleged interference, making summary judgment on this issue inappropriate. See Zirintusa v. Whitaker, 674 F. Supp. 2d 1, 8 (D.D.C. 2009) (denying summary judgment on a plaintiff's tortious interference with contract claim in part because "there [we]re genuine issues of material fact with respect to . . . the extent of damages suffered by [the plaintiff]" due to the alleged interference).

In sum, the Court concludes that genuine factual issues exist as to whether HBR knew the facts giving rise to Mukerji's contractual duty not to solicit Akin, whether HBR intentionally procured Mukerji's breach of that duty, and whether HBR's alleged interference damaged eSentio. Accordingly, the Court concludes that it must deny both eSentio's and HBR's motions for summary judgment as to eSentio's tortious interference with contract claim with respect to Akin.

### 2. King & Spalding

HBR does not dispute that Mukerji's restrictive covenant applies to King & Spalding or that it had knowledge of that fact. See HBR's Reply to eSentio's Facts ¶ 56 (not disputing that "Mukerji admitted that [King & Spalding] was covered by the restrictive covenant and that he informed HBR of this restriction"); see also id. ¶ 55 (not disputing that HBR "understood that [King & Spalding] was an eSentio 'client'"). However, HBR argues that

> [t]here is no evidence to establish the second, third, and fourth elements of [eSentio's] claim for tortious interference with contract as it relates to [King & Spalding] because: (1) HBR did not know that [ ] Mukerji's restrictive covenant applied to working on an engagement with [King & Spalding], (2) HBR did not

[REDACTED]

HBR's Mem. at 9–10. The Court will address each argument in turn.

### a. Knowledge

Notably, HBR does not dispute that it knew that Mukerji "could not solicit work from [King & Spalding]" and "could not be involved in the RFP response process to obtain the work." HBR's Mem. at 10 [REDACTED] However, HBR argues that it nonetheless lacked the requisite knowledge for eSentio's tortious interference claim because it "did not know that [ ] Mukerji's restrictive covenant applied to working on an engagement with [King & Spalding]." Id. eSentio responds that it has established HBR's knowledge because "it is not disputed that HBR knew of Mukerji's Agreement, knew that it prohibited him from 'act[ing] in any way, directly or indirectly, to solicit, divert or take away' an eSentio 'Client' or 'Prospect,' and knew that [King & Spalding] was one such prohibited 'Client' or 'Prospect.'" eSentio's Opp'n to HBR's Mot. at 13. It further argues that "HBR cannot escape liability simply by asserting that it did not know that a particular act would violate the contract, it interpreted the contract differently, or it relied on Mukerji's assertions that he could take certain actions." Id. at 12–13.

The Court agrees with eSentio that undisputed facts in the record demonstrate that HBR possessed the requisite knowledge for its tortious interference with contract claim as to King & Spalding. The undisputed evidence establishes that HBR not only knew of Mukerji's Employment Agreement and the restrictive covenant contained within it, [REDACTED] eSentio's Facts ¶ 52; see HBR's Reply to eSentio's Facts ¶ 52. And, as already explained, HBR's position that it did not understand the

scope of the restrictive covenant is irrelevant to the Court's inquiry as to the knowledge element of eSentio's claim. See Restatement (Second) of Torts § 766 cmt. i ("[I]t is not necessary that the actor appreciate the legal significance of the facts giving rise to the contractual duty[.]"); see Prudential Real Estate Affiliates, Inc. v. Long & Foster Real Estate, Inc., 208 F.3d 210 (4th Cir. 2000) (table) (concluding that a defendant could not "insulate itself from [a] tortious interference [with contract] claim by asserting that it did not know about the specific terms of the [ ] agreement"); Don King Prods., Inc. v. Douglas, 742 F. Supp. 741, 775 (S.D.N.Y. 1990) ("In a tortious interference action, a plaintiff is not required to prove that the defendant had perfect or precise knowledge of the terms and conditions of the contracts in issue."). Accordingly, the Court concludes that eSentio has satisfied the knowledge element of its claim for tortious interference with contract against HBR with respect to King & Spalding.

### b. Intentional Procurement of a Breach

HBR argues that it did not intentionally procure a breach of Mukerji's restrictive covenant as to King & Spalding because "Mukerji did not breach the [ ] Agreement, but even assuming that he did, HBR [ ] did not intentionally procure th[at] breach" because it "'walled off [ ] Mukerji such that he was not part of any discussions with the client'" and "Mukerji[ ] . . . had no role in the preparation or submission of HBR's response to [King & Spalding's] RFP." HBR's Opp'n at 9. HBR further argues that its conduct was not "improper" for these same reasons. See id. at 10. eSentio responds that Mukerji did breach his Employment Agreement and that HBR induced Mukerji's breach by "intentionally allow[ing] Mukerji to pitch himself for the work using HBR as a surrogate[] and . . . creat[ing] an ineffective 'wall' to camouflage Mukerji's efforts to divert [King & Spalding] to HBR." eSentio's Opp'n to HBR's Mot. at 17. It further argues that "HBR acted 'without legal justification'" when it "attempted to disguise

[its] conduct by omitting Mukerji from direct solicitation efforts[] but making it clear to [King & Spalding] that it was Mukerji's experience and expertise that were being pitched."  eSentio's Reply at 19.

The Court concludes that genuine factual issues exist as to whether HBR intentionally procured a breach by Mukerji of the restrictive covenant as to King & Spalding.  As already explained, a reasonable juror could infer from evidence in the record that Mukerji contributed to HBR's efforts to obtain the King & Spalding Project and thereby breached his restrictive covenant.  Thus, the Court must reject HBR's argument that eSentio's tortious interference with contract claim fails because no breach occurred.  See HBR's Opp'n at 9.  Additionally, the Court finds that a reasonable juror, viewing the facts in a light most favorable to eSentio, could also conclude that HBR induced Mukerji to breach the restrictive covenant by seeking his input on and otherwise including him in the King & Spalding Project proposal process.  A reasonable juror reaching these conclusions could also find that HBR's attempts to "wall off" Mukerji from the bidding process were not genuine (given that it included Mukerji in efforts to obtain the project), and thus, were merely attempts to conceal Mukerji's actual involvement in the proposal. Based on the plausibility of a reasonable jury reaching these conclusions, in addition to the undisputed fact that HBR knew Mukerji's restrictive covenant applied to King & Spalding, a reasonable juror could also conclude that HBR "kn[e]w[] that interference [with the restrictive covenant] [wa]s certain or substantially certain to occur as a result of [its] action[s]."  Whitt, 157 A.3d at 202 (quoting Restatement (Second) of Torts § 766 cmt. j).  Accordingly, the Court finds that a reasonable juror could conclude that HBR intentionally procured Mukerji's breach as to the King & Spalding Project.

Finally, the Court must reject HBR's argument that eSentio's claim fails because HBR's conduct was not "improper" as a matter of law. As already explained in Part III.B.1.b, supra, to show that its conduct was not improper, HBR must demonstrate that "(1) [it] has a legally protected interest, and (2) in good faith asserts or threatens to protect it, and (3) the threat [wa]s to protect it by appropriate means." NCRIC, Inc., 957 A.2d at 901. Again, HBR has failed to identify any "legally protected interest" it has that justified any intentional interference with Mukerji's restrictive covenant as to King & Spalding. Thus, the Court must conclude that genuine factual issues exist as to whether HBR intentionally procured Mukerji's breach of the restrictive covenant as to the King & Spalding Project.

### c. Damages

HBR argues that "there is no question that eSentio cannot prove the [damages] element" of its tortious interference with contract claim with respect to King & Spalding because "the evidence shows that there was zero chance eSentio would have been awarded the [King & Spalding] [P]roject, even if HBR had not submitted a proposal." HBR's Opp'n at 11 (emphasis removed). Specifically, it argues that King & Spalding "rejected eSentio's RFP before HBR even pitched the project" and that, "without HBR in the mix, Adaptive would have won, not eSentio." Id. at 12. eSentio responds that "a reasonable jury could conclude that . . . it would have been more likely than not that [King & Spalding] would have selected eSentio, or at least given eSentio renewed consideration" for the King & Spalding Project had HBR not interfered. eSentio's Opp'n to HBR's Mot. at 34.

Again, the Court finds that summary judgment against or in favor of eSentio on its claim for damages arising from its loss of the King & Spalding Project would be inappropriate because genuine factual issues exist as to whether eSentio would have been awarded the King & Spalding

Project.  HBR has identified evidence that could lead a reasonable juror to find that eSentio would not have been awarded the project in any circumstance.  For example, it cites the testimony of Eugene Viscelli—King & Spalding's Chief Information Officer, see HBR's Facts ¶ 68; eSentio's Reply to HBR's Facts ¶ 68, and a "decisionmaker [with respect to] who King & Spalding engaged for the [King & Spalding] [P]roject," HBR's Facts ¶ 68; see eSentio's Reply to HBR's Facts ¶ 68 (not disputing that Viscelli was a decisionmaker, but "disput[ing] . . . that . . . [he] made the decision . . . on his own")—that he "[p]ersonally" ruled out eSentio on January 18, 2017, HBR's Mot., Ex. 26 (Deposition of Eugene Viscelli (June 28, 2018) ("Viscelli Dep.")) 113:16–18, approximately one week after King & Spalding issued the RFP.  Additionally, it cites Viscelli's testimony that Adaptive, not eSentio, was King & Spalding's "second choice," eSentio's Mot., Ex. 110 (Viscelli Dep.) 64:19, and that Viscelli "hated working with" and "mistrust[ed]" eSentio, HBR's Mot., Ex. 26 (Viscelli Dep.) 79:13–15.

However, eSentio has identified evidence that could lead a reasonable juror to conclude that it would have been awarded the King & Spalding Project but for HBR's interference.  For example, it has identified evidence that could lead a reasonable juror to conclude that, absent Mukerji's participation, HBR would not have been able to provide adequate responses to the King & Spalding RFP.  Specifically, it is undisputed that the "RFP required bidders to identify their specific experience with iManage to NetDocuments conversion and migration in firms of similar size" and to answer other specific questions regarding NetDocuments.  See eSentio's Facts ¶ 57 (asserting that "[t]he [King & Spalding] RFP required bidders . . .to answer questions such as . . . how long do you anticipate this consulting engagement will require?"); see also HBR's Reply to eSentio's Facts ¶ 57, and that "HBR did not have experience with NetDocuments conversions for AmLaw 100 law firms without Mukerji," eSentio's Facts ¶ 58;

see HBR's Reply to eSentio's Facts ¶ 58. Such evidence could lead a reasonable juror to conclude that HBR would not have been able to prepare a competitive proposal without Mukerji's involvement.

Moreover, eSentio has identified evidence that could lead a reasonable juror to conclude that Viscelli would have awarded the King & Spalding Project to eSentio over Adaptive and other competitors. As already explained, eSentio has identified evidence that could lead a reasonable juror to conclude that eSentio was the most qualified, or only qualified, vendor for NetDocuments projects like the King & Spalding Project. See Part III.B.1.c., supra; see also eSentio's Mot., Ex. 110 (Viscelli Dep.) 64:10–13 (testifying that he could not identify "an AmLaw 100 firm that Adaptive ha[d] converted from iManage to NetDocs"). Additionally, evidence in the record demonstrates that King & Spalding valued prior experience with iManage to NetDocuments conversions at similar-sized firms, see eSentio's Facts ¶ 57 (describing several questions in the King & Spalding RFP related to prior NetDocuments experience); see also eSentio's Mot., Ex. 107 (Deposition of Mark Denner (June 15, 2018)) 240:3–8 (testifying that King & Spalding "probably" "express[ed] during the proposal process that it was important whichever organization [it] selected for the NetDocuments conversion project have experience in that space"). Furthermore, although Viscelli testified that Adaptive was King & Spalding's "second choice," eSentio's Mot., Ex. 110 (Viscelli Dep.) 64:19, he also agreed that he at one point told eSentio that he "ruled [Adaptive] out because [it was] . . . 'not strategic,'" id., Ex. 110 (Viscelli Dep.) 67:1–4. Based on this evidence, a reasonable juror could conclude that eSentio would have been awarded the King & Spalding Project absent HBR's alleged tortious interference.

Thus, the Court concludes that genuine issues of material fact exist as to whether HBR intentionally induced Mukerji to breach his restrictive covenant as to King & Spalding and whether HBR's conduct caused eSentio to suffer damage. Accordingly, the Court must deny both eSentio's and HBR's motions for summary judgment on eSentio's tortious interference with contract claim as to King & Spalding.

## C. eSentio's Tortious Interference with Prospective Economic Advantage and/or Prospective Contracts Claim (Count III)

The parties also move for summary judgment on Count III of the Complaint, <u>see</u> eSentio's Mot. at 1; HBR's Mot. at 1; Mukerji's Mot. at 1, which alleges tortious interference with eSentio's expectancy in acquiring the Akin and King & Spalding Projects against both HBR and Mukerji, <u>see</u> Compl. ¶¶ 65–76.

> To establish a claim for tortious interference with economic advantage under District of Columbia law, the evidence must show (1) the existence of a valid business . . . expectancy, (2) knowledge of the . . . expectancy on the part of the interferer, (3) intentional interference inducing or causing a . . . termination of the . . . expectancy, and (4) resultant damage.

<u>Bennett Enters., Inc. v. Domino's Pizza, Inc.</u>, 45 F.3d 493, 499 (D.C. Cir. 1995). The Court will address each of these elements in turn.

### 1. The Existence of a Valid Business Relationship or Expectancy

HBR argues that eSentio did not have a valid business expectancy in the Akin or King & Spalding Projects because both firms were "looking at several vendors as potential partners for this work." HBR's Mem. at 15; <u>see id.</u> at 17 (asserting that eSentio "had no valid business expectancy, as [King & Spalding] put out [ ] a competitive Request for Proposal to five different consultants"). As to the Akin Project specifically, HBR argues that "eSentio had no active business relationship with [Akin] during this time period," "Whelan had received negative feedback about eSentio from peers in the industry," and "eSentio's proposal was both too broad

in scope and multiples more expensive than other proposals received by the firm." HBR's Mem. at 15. As to the King & Spalding Project, HBR further argues that eSentio did not have a valid business expectancy because "[j]ust over one week after [King & Spalding] issued the RFP, eSentio was out of the running, as Viscelli determined on January 18, 2017, that he was not going to select eSentio." Id. at 17–18. Mukerji similarly argues that "Akin and [King & Spalding] gave eSentio every opportunity to win their business[,] . . . [and,] [i]n a competitive bidding environment, eSentio can reasonably expect no more than that." Mukerji's Reply at 16–17.

eSentio responds that its "expectation of securing both the Akin Project and the [King & Spalding] Project was commercially reasonable" because it "was the only consultant in the country that had the experience to effectively transition a firm as large as Akin [and King & Spalding] to NetDocuments," eSentio's Mem. at 28, and its "market leader status, its history of successful bids, and [ ] extensive experience compared to HBR's utter lack of experience on similar contracts[] . . . g[a]ve rise to its expectancy of a contract award," eSentio's Opp'n to HBR's Mot. at 23. It further argues that, as to Akin, "only two viable competitors existed—eSentio and HBR," and thus, "absent Mukerji's efforts to solicit Akin, HBR would not have been qualified and would not have been selected, leaving eSentio as the only viable alternative." Id. Finally, eSentio argues that it "had a commercially reasonable expectation of obtaining the [King & Spalding] Project" because, inter alia, it "had an ongoing relationship with [King & Spalding]" and "[o]ther vendors competing for the [King & Spalding] work were eliminated for various reasons, including lack of responsiveness and lack of consulting experience." Id. at 28–29.

District of Columbia law protects "expectancies . . . of future contractual relations, such as . . . the opportunity of obtaining customers." Carr v. Brown, 395 A.2d 79, 84 (D.C. 1978). As

this Court has previously recognized, such expectancies "arise where 'there is a background of business experience on the basis of which it is possible to estimate . . . the likelihood that the plaintiff would have received [the contract's benefits] if the defendant had not interfered.'" Nat'l R.R. Passenger Corp. v. Veolia Transp. Servs., Inc., 791 F. Supp. 2d 33, 57 (D.D.C. 2011) (omission and alteration in original) (quoting Carr, 395 A.2d at 84). However, expectancies of prospective contracts must be "commercially reasonable to anticipate." Id. at 56 (quoting Whelan v. Abell, 953 F.2d 663, 673 (D.C. Cir. 1992)). "Disappointed bidders attempting to demonstrate a valid business expectancy must therefore show a 'reasonable likelihood' of receiving a contract," id. (quoting Ellsworth Assocs., Inc. v. United States, 917 F. Supp. 841, 850 (D.D.C.1996)), and "[m]ere 'speculative contractual expectations' or 'hope' are insufficient," id. (internal citation omitted).

Here, the Court finds that eSentio has provided evidence of its business experience from which a reasonable factfinder could conclude that eSentio had a reasonable likelihood of securing both the Akin and King & Spalding Projects. For example, as discussed in Part III.B.1.c, supra, eSentio has identified evidence that could lead a reasonable juror to conclude that eSentio was the most qualified, or only qualified, vendor in the NetDocuments conversion space at the time of the bids for the Akin and King & Spalding Projects. Moreover, as already discussed in detail in Part III.B.1.c, supra, and Part III.B.2.c, supra, eSentio has identified additional evidence that could lead a reasonable juror to conclude that it was likely to prevail on its bid for the Akin and King & Spalding Projects absent HBR's alleged interference, such as evidence demonstrating that Akin viewed eSentio and HBR as the only viable competitors for the Akin Project, see eSentio's Opp'n to HBR's Mot., Ex. 109 (Whelan Dep.) 33:9–14 (agreeing that "[e]Sentio and HBR [we]re the final vendors under consideration"), and that King &

Spalding had ruled out other competitors, see eSentio's Mot., Ex. 110 (Viscelli Dep.) 67:1–4.

This evidence suffices to create a genuine factual issue as to whether eSentio had a valid

business expectancy in the Akin Project.  See Nat'l R.R. Passenger Corp., 791 F. Supp. 2d at 57

(finding that the plaintiff demonstrated a genuine factual issue as to whether it had a valid

business expectancy in a commuter rail project based on evidence that the plaintiff "ha[d] a

strong presence in commuter rail operations," "had outscored [the defendant] . . . in at least two

recent bid competitions for similar . . . contracts," and "[w]as one of 'the Big Three' in providing

commuter rail services" (citations omitted)).

　　　　HBR's counterarguments do not establish otherwise.  To the extent that it argues that

eSentio cannot demonstrate a valid business expectancy solely because Akin and King &

Spalding "w[ere] competitively bidding [out] the NetDocuments conversion consulting work,"

HBR's Mem. at 14, this Court rejects that argument for all the reasons previously explained in

National Railroad Passenger Corp., see 791 F. Supp. 2d at 56–57 (rejecting the nearly identical

argument that "a disappointed bidder in a government procurement process can never establish a

legitimate business expectancy").  Additionally, as to the Akin Project, HBR argues that

eSentio's prior NetDocuments experience was "immaterial" given that Whelan, Akin's

decisionmaker, did not "value" that experience.  See, e.g., HBR's Reply to eSentio's Facts ¶ 66.

However, the record evidence cited by HBR for this proposition does not support that eSentio's

experience was "immaterial," as it demonstrated only that Whelan believed it was too soon to tell

whether eSentio, or any other firm, was "the leader in the industry" for "large-scale

NetDoc[uments] conversions."  HBR's Mot., Ex. 10 (Whelan Dep.) 53:12–13; see id., Ex. 10

(Whelan Dep.) 53:15–17, 21 (asserting that the "small number of Am Law 100 firms that ha[d]

selected NetDocuments" made it "uncharted waters for who c[ould] be the leader").  Moreover,

evidence in the record demonstrates that experience with NetDocuments was relevant to Akin. See, e.g., HBR's Mot., Ex. 10 (Whelan Dep.) 37:18–24 (testifying that eSentio's "experience with firms of a [certain] scale and complexity" "would be something that [Akin] would consider definitely"); eSentio's Opp'n, Ex. 109 (Whelan Dep.) 48:12–16 (agreeing that if Mukerji had not gone to HBR, he would not have considered HBR for the Akin Project).

Moreover, the Court must also reject HBR's assertion that eSentio was not likely to obtain the Akin Project because "eSentio had no active business relationship with [Akin] during th[e relevant] time period." HBR's Mem. at 15. eSentio disputes this assertion, see eSentio's Facts ¶ 30, relying on undisputed evidence that "Akin was an important strategic client and prospect of eSentio," eSentio's Facts ¶ 37; see HBR's Reply to eSentio's Facts ¶ 37, and that "eSentio performed service[s] for Akin [as recently as] the spring of 2015," HBR's Reply to eSentio's Facts ¶ 38. In any event, as eSentio correctly notes, see eSentio's Opp'n at 22, an existing contractual relationship is not required to demonstrate a legitimate business expectancy, see Nat'l R.R. Passenger Corp., 791 F. Supp. 2d at 56 ("Legitimate business expectancies are those 'not grounded on present contractual relationships but which are commercially reasonable to anticipate . . . .'" (emphasis added) (citations omitted)). Rather, the existence of a prior relationship is simply one factor that a reasonable factfinder may find relevant in determining whether a reasonable likelihood of a contract exists. See, e.g., PM Servs. Co. v. Odoi Assocs., Civ. Action No. 03-1810, 2006 WL 20382, at *33 (D.D.C. Jan. 4, 2006) (finding that the plaintiff established a legitimate business expectancy in an operations and maintenance contract with a government agency based in part on evidence that the plaintiff "had a prior relationship with [the agency] doing the work at issue in the buildings at issue").

The Court must also reject HBR's remaining arguments for why eSentio did not have a valid business expectancy in the Akin and King & Spalding Projects, which rely on the same evidence that it cites to support its argument that eSentio is not entitled to damages flowing from its loss of those projects. As already explained in Part III.B.1.c, <u>supra</u>, and Part III.B.2.c, <u>supra</u>, eSentio has identified evidence creating a genuine issue of material fact with respect to whether it was likely to obtain the Akin and King & Spalding Projects absent HBR's interference. This same evidence also creates a genuine issue as to whether eSentio had a valid business expectancy in those projects.

Thus, the Court finds that genuine factual issues exist regarding whether eSentio had a legitimate business expectancy in the Akin and King & Spalding Projects. Accordingly, the Court must deny both parties' motions for summary judgment as to this element of eSentio's tortious interference with prospective economic advantage claim.

**2.      Knowledge**

HBR also argues that eSentio cannot demonstrate that HBR knew about eSentio's expectancies in the Akin and King & Spalding Projects. As to the Akin Project, HBR argues that eSentio cannot demonstrate knowledge of any valid business expectancy ███████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████  HBR's Mem. at 16.  ████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

NetDocuments [Conversion] Project," because "it was HBR's understanding that it was the only firm invited to present to [King & Spalding]." HBR's Opp'n at 16.[9]

eSentio responds that the fact "[t]hat Akin asked HBR to bid is utterly immaterial to whether or not HBR knew that eSentio had an expectancy in the [Akin] [P]roject," and that "[t]he undisputed facts show that [HBR] w[as] well aware not only of the historical eSentio/Akin relationship, but also of eSentio's likelihood of pursuing the Akin Project in light of this relationship." eSentio's Opp'n to HBR's Mot. at 24. Specifically, eSentio argues that

> (i) Akin itself informed HBR and Mukerji that [Mukerji] had performed work for [Akin] in the spring of 2015, (ii) when HBR learned that Akin intended to implement NetDocuments Mukerji informed HBR specifically that HBR 'can expect' eSentio to be 'targeting' the project, and (iii) Mukerji himself had been actively involved in pursuing and expanding the eSentio/Akin relationship in the six months before he left eSentio, which knowledge is attributable to HBR in these circumstances.

Id. eSentio further argues that, as to the King & Spalding Project, HBR "knew that eSentio and [King & Spalding] had a long history and relationship" and "anticipated that eSentio would compete for the [King & Spalding] Project." Id. at 30.

HBR's position appears to be that eSentio must show that it had actual "knowledge . . . that eSentio had submitted a bid proposal for the Akin [and King & Spalding] [P]roject[s]" in order to establish that HBR knew of eSentio's business expectancy in those projects. HBR's Opp'n at 16. However, this Court has previously rejected this position, explaining that

---

[9] Mukerji does not explicitly dispute that he possessed knowledge of eSentio's business expectancies in the Akin or King & Spalding Projects. See generally Mukerji's Mem.; Mukerji's Opp'n; Mukerji's Reply. Accordingly, the Court need not consider whether eSentio can establish the knowledge element of its tortious interference with economic advantage claim against Mukerji. See Paleteria La Michoacana, Inc. v. Productos Lacteos Tocumbo S.A. De C.V., 69 F. Supp. 3d 175, 216 (D.D.C. 2014) (concluding that, because the plaintiff did "not make an argument or provide any evidence contradicting [the defendant's] assertions regarding [certain] elements [of the defendant's counterclaim], [ ] it therefore ha[d] conceded th[ose] issues"). However, even if Mukerji did dispute eSentio's ability to establish the knowledge element of its claim, the Court would conclude that a reasonable juror could find that Mukerji possessed the requisite knowledge of eSentio's expectancies based on the evidence discussed in Part III.C.2, infra, and thus, that a genuine factual issue exists regarding this element.

> [a] party need not be shown to have had actual awareness of a business expectancy, but may be found to have knowledge of the expectancy provided that "a person believes that it is probable that something is a fact, but deliberately shuts his or her eyes or avoids making reasonable inquiry with a conscious purpose to avoid learning the truth."

Nat'l R.R. Passenger Corp., 791 F. Supp. 2d at 58 (quoting Prudential Real Estate Affiliates, Inc., 208 F.3d 210).

Here, a reasonable jury could conclude that HBR believed that eSentio was likely to submit a bid for the Akin and King & Spalding Projects. As to the Akin Project, eSentio has identified undisputed evidence that, "[i]n October 2016, when NetDocuments announced that Akin would be converting to NetDocuments, . . . Mukerji informed [HBR's] Mark Denner and Christopher Ryan that he [ ] expected eSentio to be 'targeting' the project." eSentio's Facts ¶ 86; see HBR's Reply to eSentio's Facts ¶ 86; eSentio's Mot., Ex. 90 (███████████████ ████████████████████████) at HBR_00000554 (stating, with respect to Akin's NetDocuments conversion, that "I can expect ES [eSentio] will be targeting it"). eSentio has also identified evidence that HBR knew that eSentio had a prior relationship with Akin. Specifically, it has identified evidence that around the time when HBR submitted its bid for the Akin Project, see HBR's Facts ¶ 56 (representing that "HBR submitted its statement of work" on December 28, 2016), it knew that eSentio had performed work for Akin as recently April 2015, see eSentio's Mot., Ex. 98 (████████████████████████████████████ ████) at HBR_00000517. That same evidence also suggests that, at some point prior to when HBR submitted its bid, Erik Schmidt had reason to believe that Mukerji had been involved in pursuing business with Akin while employed at eSentio. See id., Ex. 98 (██████████████ ███████████████████████████) at HBR_00000517 (Whelan asking Schmidt, "Do you still think this will be a problem with our working with Rajiv[?]" (emphasis added)).

Additionally, eSentio has identified evidence that could lead a reasonable juror to conclude that HBR knew that eSentio had a relationship with King & Spalding and would likely bid for the King & Spalding Project. For example, in a discussion between Mark Denner and Mukerji regarding the King & Spalding RFP, Denner stated that he "very much think[s] of [King & Spalding] as an eSentio client so [HBR] w[ould] tread carefully where [Mukerji was] concerned." eSentio's Mot., Ex. 63 (████████████████████████████ ████████████████) at HBR_000005345. Additionally, HBR does not dispute that it knew that King & Spalding qualified as a "prospect" under Mukerji's restrictive covenant, see eSentio's Facts ¶ 52; HBR's Reply to eSentio's Facts ¶ 52, and it thereby concedes that it knew that eSentio had recently pursued business with King & Spalding, see eSentio's Mot., Ex. 14 (Employment Agreement) § 3.8 (providing that Mukerji could not solicit "any . . . prospect that [he] ha[d] been involved in pursuing business with during the six months prior to [his] termination").

Furthermore, evidence in the record demonstrating eSentio's depth of experience with NetDocuments conversions, its being regarded by individuals in the industry as a leader in that area, and its track record of seeking and obtaining such work, see Part III.B.1.c, supra, also support eSentio's claim that the defendants knew of its expectancies in acquiring the Akin and King & Spalding Projects. Based on this evidence, the Court concludes that eSentio has created a genuine factual issue as to the knowledge element of its tortious interference with prospective economic advantage claim. See Nat'l R.R. Passenger Corp., 791 F. Supp. 2d at 59 (concluding that a genuine factual issue existed as to knowledge where "a reasonable jury could find . . . that [the defendant] was aware that . . . [the plaintiff] was going to, or likely would, submit a bid, . . . [and also] would have known that Amtrak was a competitive threat"); see also Smithfield Ham

60

& Prod. Co. v. Portion Pac, Inc., 905 F. Supp. 346, 349 (E.D. Va. 1995) (finding that a plaintiff put forth "sufficient facts to survive summary judgment" as to knowledge, in part based on evidence demonstrating that the defendant knew of the plaintiff's relationship with the customer at issue).

### 3. Intentional Interference

HBR argues that "there is no evidence in the record that demonstrates the type of egregious and improper conduct that this Court requires to articulate a tortious interference with a business expectancy claim against a competitor." HBR's Opp'n at 17.[10] Mukerji argues that eSentio has not demonstrated that he intentionally interfered with eSentio's business expectancies because he "could not have acted 'with the level of wrongful intent to constitute tortious interference' because he sincerely believed he had honored his agreement," Mukerji's Mem. at 31–32 (citation omitted), as demonstrated by his "conduct . . . reveal[ing] an abiding and enduring desire to comply with [his agreement]," id. at 31.[11]

eSentio responds that "the [d]efendants' interference with eSentio's expectancies was intentional and improper" because, inter alia, "both defendants knew that Akin was a 'client' covered by [Mukerji's] restriction" and that "[King & Spalding] was a covered 'prospect,'" but nonetheless "misrepresented to Akin [Mukerji's] ability to" participate in the Akin Project proposal, and "attempted to disguise their conduct in connection with the [King & Spalding]

---

[10] HBR also argues that eSentio has not satisfied the intentional interference element of its claim because "there is no evidence that HBR knew of eSentio's purported business expectancies," and, "[c]onsequently, it could not have intended to interfere with a business expectancy of which it was not aware and were otherwise invalid under well-settled law on tortious interference." HBR's Opp'n at 17. However, the Court must reject this argument based on its conclusion that eSentio has identified evidence that suffices to create a genuine factual issue with respect to HBR's knowledge. See Part III.C.2, supra.

[11] Mukerji also argues that he "did nothing to interfere with eSentio's opportunity for the King & Spalding [Project]," "[s]ince he had recused himself from anything to do with HBR's response to [the] King & Spalding RFP." Mukerji's Mem. at 30. However, because the Court has already concluded that a genuine factual issue exists with respect to whether Mukerji solicited the King & Spalding Project, see Part III.A.3.b, supra, the Court must reject this argument.

bid," eSentio's Mem. at 29 (emphasis omitted). It further argues that "Mukerji's assertion that he 'sincerely believed' that he acted in compliance with his Agreement is immaterial," eSentio's Opp'n to Mukeri's Mot. at 8, because Mukerji "knew that his restrictive covenant was active and binding, knew that he had been assigned business development tasks with Akin when he was still at eSentio, and knew . . . that Akin fell squarely within the Agreement's definition of 'Client,'" id. at 9.

The Restatement instructs that "interference [with prospective business relations] consists of . . . preventing [another] from acquiring or continuing [a] prospective relation," and it must be both "intentional[] and improper." Restatement (Second) of Torts § 766B. As in the context of interference with contracts, "interference with . . . [another's] prospective contractual relation is intentional if the actor desires to bring it about or if he knows that the interference is certain or substantially certain to occur as a result of his action." Restatement (Second) of Torts § 766B cmt. d; see id. § 766 cmt. j ("The rule applies, in other words, to an interference that is incidental to the actor's independent purpose and desire but known to him to be a necessary consequence of his action."). And, interference is "improper" unless the defendant can demonstrate it was "legally justified." Sorrells, 565 A.2d at 290.

The Court finds that eSentio has identified evidence that could lead a reasonable juror to believe that the defendants intentionally interfered with eSentio's expectancies by preventing eSentio from acquiring the Akin and King & Spalding Projects. As already explained, a reasonable juror could conclude that HBR's and Mukerji's actions caused eSentio to lose the Akin & King & Spalding Projects. See Part III.B.1.c, supra; see also Part III.B.2.c, supra. Additionally, a reasonable juror could also conclude that eSentio had a reasonable expectancy in these projects and that the defendants knew of that expectancy, i.e., knew that eSentio bid on, or

was likely to bid on, these projects. Based on this evidence, a reasonable juror could conclude that the defendants intentioanlly interfered with eSentio's expectancies because they knew that this interference was "certain or substantially certain to occur as a result of [their] action[s]." Restatement (Second) of Torts § 766B cmt. d.

The Court must also conclude that there exists a genuine factual issue regarding whether HBR's and Mukerji's interference was "improper." Although interference with a business expectancy, unlike interference with a contract, may be justified by a "privilege to engage in business and to compete with others," Restatement (Second) of Torts § 768 cmt. b, a defendant's privilege to compete does not justify its interference if it "employs wrongful means," id., § 768 cmt. e. Here, the Court cannot conclude as a matter of law that any interference by HBR and Mukerji was justified because a reasonable juror could find that the defendants employed wrongful means in their efforts to compete with eSentio for the Akin and King & Spalding Projects. Specifically, a reasonable juror could find that Mukerji's breaches of his restrictive covenant and HBR's inducement of those breaches amounted to "wrongful means" of competition in securing the Akin and King & Spalding Projects, and thus, could conclude that HBR's and Mukerji's interference was improper. See Nat'l R.R. Passenger Corp., 791 F. Supp. 2d at 61 (denying summary judgment on a tortious interference with prospective economic advantage claim "because[] a reasonable jury could find . . . that there [wa]s a genuine factual dispute over whether [the defendant] knew it was assisting [the plaintiff's employees] in perpetrating [ ] breaches [of their duty of loyalty] by encouraging them, or even requesting, that they refrain from being associated with [the plaintiff's] bid"); see also Restatement (Second) of Torts § 767 cmt. c (recognizing that "unlawful conduct . . . may . . . make an interference improper"). Additionally, because a reasonable juror could conclude that Mukerji knew that his

restrictive covenant applied to Akin, based on his knowledge of the facts establishing that Akin was a "client" under the Employment Agreement, that juror could also find that Mukerji misrepresented his contractual obligations when he told Whelan that there were "[n]o issues" with his working with Akin, see eSentio's Mot., Ex. 98 (████████████████████ ████████████████████) at HBR_00000516 (in response to Whelan's question to Schmidt, "Do you still think that this will be a problem with our working with Rajiv?," Mukerji responding, "No issues.  Past the statute of limitations!"), which can also be considered a "wrongful means of interference," Restatement (Second) of Torts § 767 cmt. c ("Fraudulent misrepresentations are also ordinarily a wrongful means of interference and make an interference improper.").  Accordingly, the Court must conclude that genuine factual issues exist regarding whether the defendants tortiously interfered with eSentio's prospective economic advantage as to both the Akin and King & Spalding Projects.

### 4. Damage

HBR argues that "eSentio suffered no damages caused by HBR" because, as to the Akin Project, "[a]ny 'damages' are fairly attributable to eSentio's own acts—not properly scoping work per [Akin's] request," HBR's Mem. at 16, and, as to the King & Spalding Project, King & Spalding "was never seriously considering eSentio and [it] ranked another consultant, Adaptive, as its second choice," id. at 19.  Mukerji similarly argues that "no reasonable jury can conclude that [his] conduct, if any, caused eSentio to lose the King & Spalding business," Mukerji's Mem. at 30–31, because "King & Spalding[] based its decision to remove eSentio from contention solely on eSentio's conduct, bid[,] and references," Mukerji's Opp'n at 24.  This Court must reject these arguments for the same reasons already explained in Part III.B.1.c, supra, and Part III.B.2.c, supra.  As explained in those sections, eSentio has identified evidence creating a

genuine factual issue as to whether the defendants' conduct caused eSentio to lose the Akin and King & Spalding Projects.

In sum, the Court concludes that genuine issues of material fact preclude summary judgment on eSentio's claims for tortious interference with prospective economic advantage against both HBR and Mukerji. Accordingly, the Court must deny the parties' motions for summary judgment as to these claims.

## D.    Mukerji's Counterclaim

eSentio also seeks summary judgment in its favor on Mukerji's Counterclaim, see eSentio's Mot. at 2, which alleges that eSentio breached the Bonus Provision of the Offer Letter (Count I), see Mukerji's Answer at 11, ¶¶ 7–9, and seeks a judgment "declaring that because [of that breach,] . . . Mukerji is excused from any obligations under the [E]mployment [A]greement, including any restrictive covenants" (Count II), id. at 12. The Court will address each of these Counts of the Counterclaim in turn.

### 1.    Count I

Mukerji alleges that eSentio breached the Bonus Provision of the Offer Letter in three respects: (1) it "failed . . . to set or define individual performance objectives for Mukerji," id. at 11, ¶ 7; (2) "failed . . . to conduct an annual performance review of [ ] Mukerji's employment," id. at 11, ¶ 8; and (3) "failed . . . to pay [ ] Mukerji an annual performance bonus," id. at 11, ¶ 9. As previously explained, "[t]o prevail on a claim of breach of contract [under District of Columbia law], a party must establish (1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by [the] breach." Francis, 110 A.3d at 620 (emphasis removed) (quoting Tsintolas Realty Co., 984 A.2d at 187).

eSentio does not dispute the first or fourth elements of Mukerji's claim in Count I.  See generally eSentio's Mem.; eSentio's Opp'n to Mukerji's Mot.; eSentio's Reply.  However, it disputes the second and third elements of this claim.  Specifically, as to the first breach alleged by Mukerji—that eSentio "failed . . . to set or define individual performance objectives for Mukerji," Mukerji's Answer at 11, ¶ 7—eSentio argues that it did not have a contractual duty to provide "Mukerji 'individual' performance objectives, but only 'performance objectives," and it did not breach that duty because "eSentio set 'performance objectives' for Mukerji annually in connection with the establishment of his Department's Operating Plan."  eSentio's Mem. at 32.  As to the second breach alleged by Mukerji—that eSentio "failed . . . to conduct an annual performance review of [ ] Mukerji's employment," Mukerji's Answer at 11, ¶ 8—eSentio argues that "Mukerji had no contractual right to an annual performance review," eSentio's Mem. at 32, and, even if he did, "eSentio satisfied that obligation, as [it] reviewed Mukerji's performance every year," id. at 33.  Finally, as to the third breach alleged by Mukerji—that eSentio "failed . . . to pay [ ] Mukerji an annual performance bonus," Mukerji's Answer at 11, ¶ 9—eSentio argues that it did not breach its duty to pay Mukerji an annual performance bonus because Mukerji "was judged each year against his [ ] team's Operating Plan, and in each year of his employment, his team failed to meet the established targets."  eSentio's Mem. at 33.

To determine whether eSentio breached an obligation or duty arising out of the Bonus Provision, the Court must first look to the language of the Offer Letter itself.  As already explained, under District of Columbia law, "the written language embodying the terms of an agreement will govern the rights and liabilities of the parties [regardless] of the intent of the parties at the time they entered into the contract, unless the written language is not susceptible of a clear and definite undertaking, or unless there is fraud, duress, or mutual mistake."  Tillery, 912

A.2d at 1176 (citation omitted). "If the court determines that [a] contract is unambiguous, it should rely on the contract's terms to provide 'the best objective manifestation of the parties' intent.'" Debnam v. Crane Co., 976 A.2d 193, 197 (D.C. 2009) (citation omitted). "However, if the contract is ambiguous, its proper interpretation requires consideration of extrinsic evidence, which precludes summary judgment unless the probative evidence marshaled by the movant eliminates any genuine dispute about what a reasonable person in the position of the parties would have thought the contract means." Mamo v. Skvirsky, 960 A.2d 595, 599 (D.C. 2008); see Debnam, 976 A.2d at 197–98 ("[I]f the provisions of the contract are ambiguous, the correct interpretation becomes a question for a factfinder."). "Extrinsic evidence may include the circumstances before and contemporaneous with the making of the contract, all usages—habitual and customary practices—which either party knows or has reason to know, the circumstances surrounding the transaction and the course of conduct of the parties under the contract." Tillery, 912 A.2d at 1176–77 (quoting In re Bailey, 883 A.2d 106, 118 (D.C. 2005)).

The Offer Letter's Bonus provision provides that Mukerji "will [ ] be eligible for an annual performance bonus based on the pre-defined performance objectives in the amount of [$]20,000.00 prorated from [his] start date." eSentio's Mot., Ex. 14 (Offer Letter) at LTG – 1. Mukerji argues that "eSentio defined [his] annual performance bonus objectives in his 'Compensation Plan,'" which "set a 1,000 Billable Hour target for the $20,000 Performance Bonus" and provided that "his '[p]erformance [b]onus is based on the employee's annual performance review.'" Mukerji's Reply to eSentio's Facts ¶ 103. He further argues that "eSentio's . . . 'Assessment Template' . . . defines the 'criteria for which [employees] are evaluated,'" which includes "Business Development," "Customer Satisfaction," "Company Contribution," "Professional Development," "Quality of Work," "Communication," "Attitude,"

67

"Professionalism," and "Job Specific Responsibilities." Id. (quoting eSentio's Mot., Ex. 94

(Annual Performance Review — Self Assessment ("Self-Assessment Form")) at LTG – 001159).

eSentio responds that "it is undisputed that Mukerji's entitlement to an [a]nnual [p]erformance

[b]onus was based on his Department's attainment of the Operating Plan Targets that Mukerji

and others set for their teams," eSentio's Reply at 24, and "in each year of his employment,

[Mukerji's] team failed to meet the established targets," eSentio's Mem. at 33.

To resolve the parties' dispute, the Court must determine whether the term "pre-defined

performance objectives" is ambiguous. The Offer Letter does not define the term "pre-defined

performance objectives," see id., Ex. 14 (Offer Letter) at LTG – 1 to – 2, and the Court is unable

to discern the term's meaning from any other language in the Offer Letter, see Hensel Phelps

Constr. Co. v. Cooper Carry Inc., 861 F.3d 267, 275 (D.C. Cir. 2017) (explaining that the

"objective analysis [required under District of Columbia law] also considers the context in which

words are used"). Moreover, although the Offer Letter incorporates Mukerji's Employment

Agreement, see eSentio's Mot., Ex. 14 (Offer Letter) at LTG – 1 to – 2 (stating that "this letter,

together with the [Employment Agreement], contain the entire agreement and understanding

between [Mukerji] and eSentio"), the Employment Agreement also does not define, or even refer

to, the pre-defined performance objectives, see id., Ex. 14 (Employment Agreement) at LTG –3

to –7. Furthermore, despite Mukerji's insistence that the term is defined in his Compensation

Plan and in the Self-Assessment Form, the Court agrees with eSentio that these documents were

"never incorporated into, and never became part of, the Offer Letter." eSentio's Mem. at 32.

The Offer Letter does not reference either of these documents, and indeed, it contains an

integration clause expressly "supersed[ing]" any agreements existing prior to the Offer Letter,

see eSentio's Mot., Ex. 14 (Offer Letter) at LTG –1 to –2 (providing that the Offer "[L]etter,

together with the [Employment Agreement], . . . will supersede any prior or contemporaneous agreements, understandings, term sheets, communications, offers, representations, warranties, or commitments by or on behalf of eSentio (oral or written)"), which would appear to include the Compensation Plan sent to Mukerji prior to the execution of the Offer Letter, see eSentio's Facts ¶ 91. Thus, because there is no indication that the Compensation Plan and the Self-Assessment Form were part of the Offer Letter, and because District of Columbia law provides that "the existence of ambiguity is a question of law for the Court, to be ascertained from the four corners of the contract," Katopothis v. Windsor-Mount Joy Mut. Ins. Co., 211 F. Supp. 3d 1, 17 (D.D.C. 2016), aff'd in part, appeal dismissed in part, 905 F.3d 661 (D.C. Cir. 2018), the Court may not consider these documents for the purpose of determining whether the term "pre-defined performance objectives" is ambiguous.

In the absence of any guidance in the contract itself to aid in assessing the definition of the term "pre-defined performance objectives," the Court must look to the plain meaning of the term. See, e.g., Interstate Fire & Cas. Co. v. Wash. Hosp. Ctr. Corp., 758 F.3d 378, 383–84 (D.C. Cir. 2014) (collecting District of Columbia cases). However, here, the plain meaning does not bring any clarity to the definition, as the words "performance" and "objectives" have broad definitions that could encompass numerous criteria related to goals for employees' performance of their jobs, including any of the criteria asserted by the parties. See Performance, Merriam-Webster Dictionary Online, https://www.merriam-webster.com/dictionary/performance (last visited Apr. 26, 2019) (defining "performance" as "the execution of an action," "something accomplished," or "the fulfillment of a claim, promise or request"); see also Objective, Merriam-Webster Dictionary Online, https://www.merriam-webster.com/dictionary/objective (last visited Apr. 26, 2019) (defining "objective" as "something toward which effort is directed: an aim, goal,

or end of action"). Moreover, the term "pre-defined" necessarily refers to some definition previously created, see Predefined, Merriam-Webster Dictionary Online, https://www.merriam-webster.com/dictionary/pre-defined (last visited Apr. 26, 2019) (defining "predefined" as "defined in advance"), but because no such definition is included in the Offer Letter, it is impossible for the Court to discern from the four corners of the document what that definition might be. Accordingly, the Court concludes that the term "pre-defined performance objectives" is ambiguous.

Because the term "pre-defined performance objectives" is ambiguous, the Court must conclude that "its proper interpretation requires consideration of extrinsic evidence, which precludes summary judgment unless the probative evidence marshaled by the movant eliminates any genuine dispute about what a reasonable person in the position of the parties would have thought the contract means." Mamo, 960 A.2d at 599. And, the Court cannot conclude that the extrinsic evidence relied upon by eSentio satisfies this standard. In support of its position, eSentio asserts that "Mukerji admitted that eSentio had always understood that his [a]nnual [p]erformance [b]onus was based on his Department meeting its Operating Plan numbers," eSentio's Mem. at 31, and that because "Dornic reminded Mukerji that his annual bonus was based on his team meeting its Operating Plan numbers[] . . . in the spring of 2012," eSentio's Facts ¶ 97 (internal citation omitted), "Mukerji ratified the terms of the bonus program by continuing as an at-will employee of e-Sentio[] . . . for four years after" Dornic's and Mukerji's discussion on the topic, eSentio's Mem. at 35.

The Court cannot agree with eSentio that Mukerji "admitted that eSentio had always understood that his [a]nnual [p]erformance [b]onus was based on . . . [his team's] Operating Plan numbers." eSentio's Mem. at 31; see Mukerji's Reply to eSentio's Facts ¶ 100 (disputing this

claim). Although Mukerji does not dispute that Dornic told him "that his bonus eligibility would be based on his DMS team meeting its Operating Plan numbers," Mukerji's Reply to eSentio's Facts ¶ 98, he asserts that this conversation took place in 2013, not 2012, see id. ¶ 97, and, in any event, he testified that Dornic's view "was not in accordance with [his] agreement and was not accepted by [him]," eSentio's Mot., Ex. 16 (Mukerji Dep.) at 81:6–9. Moreover, although Mukerji testified that during their discussion Dornic "clarified what her intent was," id., Ex. 16 (Mukerji Dep.) 87:12, a reasonable juror could interpret this statement as meaning that Dornic clarified what her intent was when her conversation with Mukerji occurred, rather than what her intent was when she signed the Offer Letter.

Additionally, the Court cannot agree with eSentio's position that Mukerji "ratified" eSentio's understanding of the term "pre-defined performance objectives." eSentio's Mem. at 35. Although there are circumstances in which an employee's continuation of his employment creates an implied agreement to modify an existing employment contract, see, e.g., Nat'l Rifle Ass'n v. Ailes, 428 A.2d 816, 822 (D.C. 1981) ("[O]nce an employee learns about a new policy limiting compensation for unused leave upon termination, but elects to stay on the job and accept compensation, that decision is sufficient to imply an agreement to continue working subject to the new limitation." (emphasis added)), eSentio insists that its "argument is not that the contract regarding bonuses was 'amended,' because Mukerji's [a]nnual [p]erformance [b]onuses were never intended to be based on anything other than his Department's performance against the Operating Plan Targets," eSentio's Reply at 25, and thus, the case law regarding modification cited by eSentio is inapposite. Therefore, it appears that Mukerji's continuation of his employment with eSentio following his conversation with Dornic is more properly considered as evidence of the parties' "course of conduct" that could be used to support eSentio's interpretation

of the Offer Letter.  See Tillery, 912 A.2d at 1176–77.  However, although such evidence "is often the strongest evidence of [the parties'] meaning," it "is not conclusive of [the] meaning," Restatement (Second) of Contracts § 202 cmt. g, and is only one of several types of extrinsic evidence that may be considered by the factfinder, see Tillery, 912 A.2d at 1176–77.  Thus, the Court cannot conclude that this evidence is determinative of the parties' intended meaning of the term "the pre-defined performance objectives" either.

Moreover, there exists evidence of "the circumstances before and contemporaneous with the making of the contract," Tillery, 912 A.2d at 1176, from which a reasonable juror could conclude that it was not Dornic's or eSentio's intent when the Offer Letter was signed to base Mukerji's bonus solely on the Operating Plan numbers.  For example, one day prior to sending the Offer Letter to Mukerji and just several days before Mukerji signed the Offer Letter, eSentio provided Mukerji with the Compensation Plan, see eSentio's Facts ¶ 91 (stating that eSentio provided the Compensation Plan to Mukerji "in connection with a packet of company information . . . on or about June 17, 2011"); see also eSentio's Mot., Ex. 92 (█████████ ████████████████████████████████████████████████) at LTG – 631 (attaching Compensation Plan and Employment Agreement), which stated that "[t]he [p]erformance [b]onus is based on the employee[']s annual performance review," eSentio's Mot., Ex. 92 (Compensation Plan) at LTG – 645; see Mukerji's Mot., Ex. K (Deposition of Yvonne Dornic (June 29, 2018) ("Dornic Dep.")) 136:1 (testifying that the "[p]erformance [b]onus referred to in the Compensation Plan was "the same thing" as the annual performance bonus referred to in the Offer Letter).  Additionally, the Self-Assessment Form that Dornic sent to Mukerji in 2013 states that "eSentio ha[d] a compensation model for [his] position in which [he was] evaluated on [his] performance each [ ] year" and identifies "[t]he criteria for which

[Mukerji was] evaluated," eSentio's Mot., Ex. 94 (Self-Assessment Form) at LTG – 1159, which included numerous factors, only one of which was "Operating Plan Goals," id., Ex. 94 (Self-Assessment Form) at LTG – 1160. Furthermore, Dornic testified that she based Mukerji's 2011 bonus on "the utilization target for [Mukerji's] team, as well as his hiring plan," Mukerji's Opp'n, Ex. K (Dornic Dep.) 126:2–5, which a reasonable juror could conclude is different from "Operating Plan Goals," eSentio's Mot., Ex. 94 (Self-Assessment Form) at LTG – 1160 (distinguishing "Utilization Target[s]" from "Operating Plan Goals," the latter being described as "Revenue Projections" and "Costs"); see Mukerji's Reply to eSentio's Facts ¶ 102; Mukerji's Opp'n, Ex. W (Affidavit of Rajiv Mukerji in Opposition to Legal Technology Group, Inc.'s Motion for Summary Judgment as to Liability on [I]ts Claims Against Him and His Counterclaim for Breach of LTG's Promise to Pay an Annual Bonus) ¶¶ 21–25, 36 (describing "Operating Plan revenue or hiring targets" and distinguishing them from "Utilization Target[s]").

In sum, a reasonable juror could conclude that the parties intended "the pre-defined performance objectives" to be "based on . . . [Mukerji's] annual performance review," eSentio's Mot., Ex. 92 (Compensation Plan) at LTG – 645, which included a review of numerous different objectives beyond just the Operating Plan Goals, see id., Ex. 94 (Self-Assessment Form) at LTG – 001159 to – 60. Having concluded that this is a viable interpretation of Mukerji's Offer Letter, the Court must next turn to Mukerji's specific claims that eSentio violated the Offer Letter.

First, the Court concludes that genuine factual issues preclude summary judgment as to Mukerji's claim that eSentio breached the Offer Letter by "fail[ing] . . . to set or define individual performance objectives for [him]," Mukerji's Answer at 11, ¶ 7, because the issue of whether eSentio failed to set the requisite "performance objectives" necessarily depends on a

reasonable juror's interpretation of that term. And, because a reasonable juror could conclude that the "performance objectives" included all of the objectives set forth in the Self-Assessment Form, and eSentio asserts that it set performance objectives only with respect to Mukerji's Operating Plan Goals, see eSentio's Mem. at 32, a reasonable juror could find that eSentio did not set performance objectives for Mukerji in accordance with the Offer Letter.

Similarly, genuine factual issues also preclude summary judgment as to Mukerji's claim that eSentio breached the Offer Letter by "fail[ing] . . . to conduct an annual performance review of [ ] Mukerji's employment." Mukerji's Answer at 11, ¶ 8. Although neither the Offer Letter nor the Employment Agreement explicitly obligates eSentio to perform an annual performance review, the Court cannot agree with eSentio that "Mukerji had no contractual right to an annual performance review." eSentio's Mem. at 32. For the reasons already explained, the Court concludes that a reasonable juror could find that the "pre-defined performance objectives" referred to in the Offer Letter, refer to the results of Mukerji's annual performance review, which would mean that the Bonus Provision necessarily requires eSentio to conduct such a review. Additionally, eSentio's assertion that it "reviewed Mukerji's performance every year," id. at 33, does not resolve Mukerji's claim either, because a reasonable juror who concluded that an annual performance review requires consideration of all of the factors in the Self-Assessment Form could also conclude that eSentio did not conduct an adequate review. See, e.g., eSentio's Mot., Ex. 1 (Dornic Dep.) 185:22–26 (testifying that the review provided to Mukerji "for most years [ ] was . . . a discussion about where performance needs to be improved").

Finally, the Court concludes that genuine factual issues preclude summary judgment on Mukerji's claim that eSentio breached the Offer Letter by "fail[ing] . . . to pay [ ] Mukerji an annual performance bonus." Mukerji's Answer at 11, ¶ 9. Because eSentio's only argument for

why it did not commit this breach is based on its position that the pre-defined performance objectives were limited to the Operating Plan Targets, see eSentio's Mem. at 33 (arguing that it did not breach its duty to pay Mukerji an annual performance bonus because Mukerji "was judged each year against his [ ] team's Operating Plan, and in each year of his employment, his team failed to meet the established targets"), and the Court has concluded that a reasonable juror could reject this premise, the Court cannot conclude that eSentio has satisfied its burden to demonstrate that summary judgment in its favor is warranted on this claim.

Accordingly, the Court concludes that it must deny eSentio's motion for summary judgment as to Count I of Mukerji's Counterclaim.

### 2. Count II

For the reasons already explained in Part III.A.5, supra, the Court concludes that any breach by eSentio with respect to payment of a bonus cannot excuse any breach by Mukerji of the restrictive covenant, see Ashcraft & Gerel, 244 F.3d at 951, and thus, the Court must grant summary judgment to eSentio as to Count II of Mukerji's Counterclaim.

### E. Punitive Damages

HBR and Mukerji finally seek summary judgment in their favor on eSentio's claim for punitive damages. See HBR's Mot. at 1; Mukerji's Mot. at 2. They argue that summary judgment is appropriate because "there is absolutely no evidence that [Mukerji or] any HBR employee acted with evil motive, actual malice, deliberate violence or oppression, or with intent to injure eSentio." HBR's Mem. at 19; see Mukerji's Mem. at 32 (incorporating the arguments in HBR's memorandum in support of summary judgment). eSentio responds that summary judgment on this issue is improper because "there exist disputed facts from which a jury may conclude that the [d]efendants' conduct was deliberately deceptive and carried out to hamstring

the market leader [for] their [ ] own benefit," which "would entitle eSentio to punitive damages." eSentio's Opp'n to HBR's Mot. at 36–37.

As the District of Columbia Court of Appeals has explained,

> punitive damages are not favored in the law. The most appropriate field for their application is the realm of tort actions generally; but even there, they are available only in cases which present circumstances of extreme aggravation. The defendant's tortious conduct must have been outrageous, characterized by malice, wantonness, gross fraud, recklessness, or willful disregard of the plaintiff's rights.

Choharis v. State Farm Fire & Cas. Co., 961 A.2d 1080, 1090 (D.C. 2008) (quoting Sere v. Grp. Hosp., Inc., 443 A.2d 33, 37 (D.C. 1982)). Although the Court is skeptical that eSentio will ultimately be able to prove the "circumstances of extreme aggravation" necessary for an award of punitive damages on its tort claims, the Court cannot conclude on the existing record that no reasonable juror could find that such circumstances have been proven. As already explained, a reasonable juror could find that Mukerji breached his restrictive covenant as to Akin and King & Spalding, that HBR induced those breaches, and that both defendants engaged in efforts to either misrepresent Mukerji's contractual obligations or conceal his breaches. Because the District of Columbia Court of Appeals has affirmed a punitive damages award based on similar conduct, see Dyer v. William S. Bergman & Assocs., 657 A.2d 1132, 1138 (D.C. 1995) (affirming a punitive damages award for a tortious interference with contract claim based on evidence that a defendant "betrayed his trust by misappropriating [his employer's] records and[] . . . wrongfully stealing one of its principal clients"), the Court finds that it would be premature to conclude as a matter of law that the conduct here is insufficient to demonstrate entitlement to punitive damages, cf. Hickey v. Scott, 162 F. Supp. 3d 1, 3 (D.D.C. 2011) ("[B]ecause '[t]here is some support in District of Columbia law for the notion that punitive damages can be awarded for a breach of fiduciary duty,' the Court finds that the decision on the issue of punitive damages should be deferred at least until after the presentation of [the plaintiff's] case-in-chief on her

breach of fiduciary duty claim."). Accordingly, the Court concludes that it must deny the defendants' motions for summary judgment as to eSentio's claims for punitive damages.

## IV.    CONCLUSION

For the foregoing reasons, the Court concludes that Mukerji breached his restrictive covenant as to Akin, and thus, summary judgment in eSentio's favor is warranted as to this aspect of eSentio's breach of contract claim raised in Count I of its Complaint. The Court also concludes that eSentio is entitled to summary judgment on Count II of Mukerji's Counterclaim. However, the Court concludes that genuine issues of material fact preclude summary judgment as to all other aspects of eSentio's claims and Mukerji's Counterclaim. Accordingly, the Court concludes that it must grant in part and deny in part eSentio's motion for summary judgment and deny the defendants' motions for summary judgment.[12]

**SO ORDERED** this 13th day of May, 2019.

REGGIE B. WALTON
United States District Judge

---

[12] The Court will contemporaneously issue an Order consistent with this Memorandum Opinion.